# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: ENTERPRISE RENT-A-CAR WAGE & HOUR EMPLOYMENT PRACTICES LITIGATION | |
| | MDL No. 2056 |
| NICKOLAS HICKTON, et. al. | |
| Plaintiffs, | Misc. No. 2:09-mc-00210-JFC |
| | Civ. No. 2:07-cv-01687-JFC |
| v. | Civ. No. 2:09-cv-00815-JFC |
| | Civ. No. 2:09-cv-00816-JFC |
| ENTERPRISE RENT-A-CAR COMPANY, et. al. | Civ. No. 2:09-cv-00824-JFC |
| | Civ. No. 2:09-cv-00832-JFC |
| Defendants. | Civ. No. 2:09-cv-00833-JFC |
| | Civ. No. 2:09-cv-01188-JFC |
| | Civ. No. 2:09-cv-01321-JFC |
| THIS DOCUMENT RELATES TO: | |
| *All Actions* | |

## MEMORANDUM OPINION

CONTI, District Judge.

Pending before this court are two motions filed by defendant Enterprise Rent-A-Car Company[1] ("ERAC-Missouri" or "defendant parent"). The first is a motion to dismiss the amended master complaint with respect to claims asserted against defendant parent. (Docket No. 65, Misc. No. 09-210.) The second is a motion seeking summary judgment in favor of defendant parent on joint employer issues. (Docket No. 124.)

---

[1] After the filing of the motions Enterprise Rent-A-Car Company changed its name to Enterprise Holdings, Inc. (See Docket No. 136, Misc. No. 09-210.)

*I. Procedural Background*

The issues raised in the motion to dismiss the amended master complaint were briefed in connection with two motions to dismiss, stay, or transfer, which, on November 6, 2009, were dismissed without prejudice due to the filing on September 18, 2009 of the amended master complaint (Docket No. 35).

The first motion to dismiss, stay, or transfer (Docket No. 12, Civ. No. 07-1687) was filed by defendants ERAC-Missouri and Enterprise Rent-A-Car Company of Pittsburgh[2] ("ERAC-Pittsburgh," and together with ERAC-Missouri, "Hickton defendants"). The movant sought to dismiss, stay, or transfer the claims set forth in the complaint (Docket No. 1) filed by Nickolas C. Hickton ("Hickton"), on behalf of himself and all others similarly situated. The motion alleged, inter alia, that this court lacks personal jurisdiction over ERAC-Missouri and asked for the claims against ERAC-Missouri to be dismissed. After a hearing on April 23, 2008, the court ordered a stay, among other things, of all claims against ERAC-Missouri, due to a prior pending action against ERAC-Missouri in the United States District Court for the Eastern District of Missouri, Zabady v. Enterprise Rent-A-Car Co., No. 4:07-CV-04494 (E.D. Mo.). (Docket No. 39.)

In a letter submitted on September 15, 2008, Hickton informed the court that all collective action claims were dismissed in Zabady. (See Docket No. 48.) In response, Hickton defendants submitted a letter on October 10, 2008. (Docket No. 48.) In the letter, Hickton defendants argued that the stayed portions of the lawsuit cannot proceed because the court lacks personal jurisdiction over ERAC-Missouri and that the claims against ERAC-Missouri should be

---

[2] After the filing of the motion Enterprise Rent-A-Car Company of Pittsburgh changed its organizational structure from a corporation to a limited liability company with the name of Enterprise Rent-A-Car Company of Pittsburgh, LLC. (See Docket No. 136, Misc. No. 09-210.)

dismissed or transferred to the United States District Court for the Eastern District of Missouri.

(Id.)  Following a status conference on October 15, 2008, this court ordered the parties to brief

the issue whether personal jurisdiction exists over ERAC-Missouri. On April 10, 2009, Hickton

submitted a memorandum of law in support of this court's exercise of personal jurisdiction.

(Docket No. 63.)  On May 8, 2009, Hickton defendants filed a memorandum of law in opposition

to the exercise of personal jurisdiction and in further support of ERAC-Missouri's motion to

dismiss.  (Docket No. 80.)  On May 27, 2009, Hickton filed a reply memorandum of law.

(Docket No. 93.)

The second motion to dismiss, stay, or transfer (Docket No. 18, Civ. No. 09-832) was

filed on September 29, 2008 in Averill v. Enterprise Rent-A-Car Co., No. 1:08-cv-04191 (N.D.

Ill.), by defendant ERAC-Missouri.  The motion sought to dismiss for lack of jurisdiction, stay,

or transfer to the United States District Court for the Eastern District of Missouri the complaint

of plaintiff Michael Keith Averill ("Averill," and together with Hickton and the other plaintiffs

in the consolidated actions, "plaintiffs").  (Docket No. 6.)  On November 3, 2008, Averill filed a

response to ERAC-Missouri's motion to dismiss, stay, or transfer (Docket No. 32), raising

arguments similar to those raised in the Hickton case.  ERAC-Missouri filed a reply

memorandum in support of the motion to dismiss, stay, or transfer on December 1, 2008.

(Docket No. 40.)

On June 10, 2009, the Hickton and Averill cases, among others, were consolidated by the

Judicial Panel on Multidistrict Litigation for pretrial purposes in this court.  This court heard oral

argument on the two pending motions to dismiss on August 12, 2009.  The court ordered

subsequent briefing on several issues.  On September 14, 2009, ERAC-Missouri filed a

supplemental brief on personal jurisdictional matters (Docket No. 30), and plaintiffs filed a

supplemental memorandum of law in support of this court's exercise of jurisdiction (Docket No. 31). On October 5, 2009, ERAC-Missouri filed a reply to plaintiffs' supplemental memorandum of law (Docket No. 50), and plaintiffs filed a response to ERAC-Missouri's supplemental jurisdictional brief (Docket No. 51).

Hickton and Averill each filed separate collective actions under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq. ("FLSA"), among other claims. Hickton's action was brought against ERAC-Missouri, its operating subsidiary, ERAC-Pittsburgh, and Does 1 through 10. Hickton's complaint was filed December 11, 2007 in this district. (Docket No. 1, Civ. No. 07-1687.) Averill's action was brought only against ERAC-Missouri. Enterprise Leasing Company of Chicago[3] ("ELC-Chicago") was ERAC-Missouri's operating subsidiary at issue in that case. Averill's complaint was originally filed on July 23, 2008 in the United States District Court for the Northern District of Illinois. (Docket No. 1, Civ. No. 09-832.) Hickton and Averill filed notices of adoption of the amended master complaint with respect to their actions. (See Docket Nos. 38, 39, Misc. No. 09-210.) The amended master complaint names as defendants, among others: ERAC-Missouri, ERAC-Pittsburgh, and ELC-Chicago. (Docket No. 35.) Averill's action is now proceeding against ERAC-Missouri and ELC-Chicago. (See Docket No. 38.)

The motion for summary judgment was filed on February 26, 2010 (Docket No. 124, Misc. No. 09-210). In that motion, ERAC-Missouri argues that, although plaintiffs allege that ERAC-Missouri is a joint employer of plaintiffs under the FLSA, the undisputed facts show that it did not employ plaintiffs. On March 15, 2010, ERAC-Missouri filed a brief in support of the motion (Docket No. 147), an appendix of exhibits (Docket No. 150), and a statement of facts

---

[3] After the filing of the motion Enterprise Leasing Company of Chicago changed its organizational structure from a corporation to a limited liability company with the name of Enterprise Leasing Company of Chicago, LLC. (See Docket No. 136, Misc. No. 09-210.)

(Docket No. 148).  On March 29, 2010, plaintiffs filed a memorandum in opposition to ERAC-Missouri's motion (Docket No. 154), an appendix of exhibits (Docket No. 155), and a reply statement of facts (Docket No. 153).  On April 12, 2010, ERAC-Missouri filed a reply memorandum in support of its motion (Docket No. 162), an additional exhibit (Docket No. 164), and a reply and consolidated statement of facts (Docket No. 163).  On May 10, 2010, ERAC-Missouri filed a notice of supplemental authority (Docket No. 168).  Plaintiff responded to notice of supplemental authority on May 13, 2010.  (Docket No. 170.)

The court originally scheduled oral argument to take place on May 21, 2010 with respect to the motion for summary judgment on joint employer issues, but at that hearing the court ordered additional briefing on several topics.  On May 27, 2010, ERAC-Missouri filed a supplemental brief (Docket No. 177), and on May 28, 2010, plaintiffs filed their brief (Docket No. 179) and a declaration of counsel Peter Muhic to which exhibits were attached (Docket No. 180).  On June 7, 2010, the court heard oral argument on the issues raised in the motion for summary judgment.

For the reasons explained more fully in this memorandum opinion, the court will deny without prejudice ERAC-Missouri's motion to dismiss and grant ERAC-Missouri's motion for summary judgment on joint employer issues.


## II. Factual Background

### A. ERAC-Missouri

ERAC-Missouri is incorporated under Missouri law and maintains a principal place of business in St. Louis, Missouri.  (Ex. 1 ¶ 3 to Hickton defendants' memorandum of law in opposition to the exercise of personal jurisdiction and in further support of ERAC-Missouri's

motion to dismiss (Docket No. 80, Civ. No. 07-1687) ("Def.'s Br. Hickton").)  At the time these actions were commenced, ERAC-Missouri was the sole shareholder of thirty-eight subsidiaries in the United States that rent and sell vehicles.[4]  (Consolidated statement of facts (Docket No. 163) ("C.S.F.") ¶ 1; appendix of exhibits in support of motion for summary judgment on joint employer issues (Docket No. 150) ("Def.'s App."), Ex. 1 ¶ 5.)  ERAC-Missouri is a subsidiary of The Crawford Group, Inc. (the "Crawford Group").  (Ex. A ¶ 3 to ERAC-Missouri's reply memorandum in support of the motion to dismiss, stay, or transfer (Docket No. 40, Civ. No. 09-832) ("Def.'s Reply Averill").)

The Crawford Group is the sole owner of The Crawford Group-Information Systems ("CGIS").  CGIS owned and maintained the "Enterprise brand"[5] website, www.enterprise.com. (Id.)[6]  The website does not distinguish between ERAC-Missouri and its operating subsidiaries, and the website states that Enterprise Rent-A-Car has 878,000 vehicles, 64,000 employees,[7] and 6,900 offices in the United States and other countries.  (Ex. R ¶¶ 5, 6 to Hickton's memorandum of law in support of this court's exercise of personal jurisdiction (Docket No. 63, Civ.No. 07-1687) ("Pl.'s Br. Hickton").)  Based upon these statistics, Enterprise Rent-A-Car claims on the

---

[4] Plaintiffs argue that Rick Short ("Short"), senior vice president of business management at ERAC-Missouri, testified that ERAC-Missouri not only owned the subsidiaries, but also operated the subsidiaries.  Short stated, "So the name of the parent company was changed to reflect not just the Enterprise Rent-A-Car brand, but to represent that it was a holding company owning and operating subsidiaries that operate three distinct rental car brands." (Appendix of exhibits in support of plaintiffs' memorandum of law in opposition to motion for summary judgment on joint employer issues (Docket No. 155), Ex. 2 at 12.)  Short indicated on the deposition's errata sheet, however, that inclusion of the word "and" between "owning" and "operating" was an error in the transcription of his deposition, and that it should read "owning operating."  (Id. at "Errata Sheet.").

[5] The "Enterprise brand" is an internal reference used by defendant parent to include the employees of ERAC-Missouri and its operating subsidiaries. The term is also a means of referring to the entire Enterprise-Rent-A-Car network as one entity.  (Ex. A at 50-51 to Pl.'s Br. Hickton.)  The court will refer to the entire organization as the "Enterprise brand," Enterprise Rent-A-Car," or "ERAC."

[6] During oral argument on August 12, 2009, it was revealed that ERAC-Missouri assumed the responsibilities of CGIS with respect to the website.  "Subsequent to the filing of the lawsuit, the website is operated directly by the Enterprise Rent-A-Car Company."  (Oral Argument Tr. Aug. 12, 2009 (Docket No. 59, Misc. No. 09-210) at 44.)

[7] A fact sheet for Enterprise Holdings, Inc. states that it has 68,000 employees.  (Appendix of exhibits in support of plaintiffs' memorandum of law in opposition to motion for summary judgment on joint employer issues (Docket No. 155), Ex. 12.)

website that it is the largest rental car company in North America, with a "World Headquarters" in St. Louis, Missouri. (Ex. L to Pl.'s Br. Hickton; <u>see</u> appendix of exhibits in support of plaintiffs' memorandum of law in opposition to motion for summary judgment on joint employer issues (Docket No. 155) ("Pls.' App."), Ex. 12.) ERAC-Missouri, however, maintains that it has no offices or employees in Pennsylvania or Illinois. (Ex. 1 ¶ 5 to Def.'s Br. Hickton; Ex. D ¶ 6 to ERAC-Missouri's memorandum of points and authorities in support of ERAC-Missouri's motion to dismiss, stay, or transfer (Docket No. 20, Civ. No. 09-832) ("Def.'s Br. Averill").)

ERAC-Missouri does not directly rent or sell vehicles anywhere in the world. (Ex. 1 ¶ 11 to Def.'s Br. Hickton.) Instead, wholly-owned operating subsidiaries of ERAC-Missouri conduct all rental services and vehicle sales. (<u>Id.</u> ¶ 14.) ERAC-Missouri directly or indirectly supplies each operating subsidiary with administrative services including, but not limited to: business guidelines, employee benefit plans, rental reservation tools like enterprise.com, a customer contact center, insurance, information technology, and legal services. (<u>Id.</u> at ¶ 11; Ex. 5 at 46, 227, 239 to Def.'s Br. Hickton.) ERAC-Missouri offers many of these services to the operating subsidiaries at an advantageous price, because ERAC-Missouri achieves economies of scale. (<u>See</u> Def.'s App., Ex. 2 ¶ 15.) The business guidelines are distributed to the employees of the subsidiaries in a policy manual, titled "Business Ethics Guide, Personnel Policy, and Benefits Summary Plan Description," that states "Information contained in the Business Ethics Guide, Personnel Policy, and Benefits Summary Plan Description refers to employees of: The Crawford Group, Inc., Enterprise Rent-A-Car Company and their various operating subsidiaries." (Ex. 13 at P0157 to Averill's response to defendant's motion to dismiss, stay, or transfer (Docket No. 32, Civ. No. 09-832) ("Pl.'s Br. Averill").) Later in the policy manual, the word "employee" is defined as "the person (who is not a dependent) on whose behalf the plan is established.

Employees include only the common-law employees of Enterprise." (Id. at P0181.) ERAC-Missouri also authorizes its operating subsidiaries to use the name "Enterprise Rent-A-Car" and other registered trademarks. (Ex. Q ¶ 3 to Def.'s Reply Averill.)

Each operating subsidiary remunerated ERAC-Missouri in the form of corporate dividends and management fees. (Ex. 1 ¶ 10 to Def.'s Br. Hickton; Ex. 3 ¶ 10 to Def.'s Br. Hickton; Ex. D ¶ 9 to Def.'s Br. Averill.) The board of directors for each operating subsidiary decided on a quarterly basis whether to pay a dividend to ERAC-Missouri.[8] (Ex. I at 11 to Hickton's reply memorandum of law in support of this court's exercise of personal jurisdiction (Docket No. 93, Civ. No. 07-1687) ("Pl.'s Reply Hickton").) ERAC-Missouri recognized these dividends as an increase in equity and did not report the dividend on its federal income tax statements. (Id.) Likewise, the operating subsidiaries did not take a deduction for dividends paid. (Id.) ERAC-Missouri determines annually the amount of management fees to charge each operating subsidiary. (Id.) Management fees offset the expenses for services provided by defendant parent to the operating subsidiaries and are recorded as income and reported on ERAC-Missouri's federal income tax statements. (Id.) Since the management fees are considered an ordinary business expense, operating subsidiaries claim a tax deduction for their payment. (Id.)

**B. Administrative Services Offered to Subsidiaries**

ERAC-Missouri also wholly owns operating subsidiaries that do not rent or sell vehicles. A financial subsidiary, ERAC USA Finance, serves as the treasury department for ERAC-Missouri and the ERAC operating subsidiaries. (Ex. B at 27 to Pl.'s Br. Hickton.) ERAC USA

---

[8] After the briefing and discovery on the motions to dismiss, the subsidiaries converted from corporations to limited liability companies. (See Docket No. 136, Misc No. 09-210.) For further discussion on this conversion, refer to note 9 infra.

Finance's primary responsibility is to borrow funds from third-party lenders and lend them to the operating subsidiaries for use in their day-to-day business operations. (Id.) ERAC-Missouri wholly owns ELCO Administrative Services Co. ("ELCO"), a subsidiary devoted to securing a high level of insurance and facilitating the settlement of liability claims. (Id. at 225.) While the rental operating subsidiaries obtain their own insurance for vehicle damage and limited amounts for personal injury claims, the coverage sourced by ELCO is for claims in excess of the individual subsidiary's coverage. (Id. at 227.) The costs for this additional group insurance are divided proportionately and billed directly by ELCO to the individual operating subsidiaries. (Id. at 227.)

Prior to January 2008, ERAC-Missouri directly operated a contact center for customer support in St. Louis. (Ex. D at 22-23 to Pl.'s Br. Hickton.) In January 2008, ERAC-Missouri reorganized the contact center division into an operating subsidiary. (Id. at 22.) The functionality of the contact center as an operating subsidiary is identical to its role as a division of ERAC-Missouri. (Id.) Customers call the contact center by dialing a toll-free number that corresponds with the customer's concern. (Ex. E at 20 to Pl.'s Br. Hickton.) One function of the contact center is to allow customers to book vehicle reservations at any of ERAC-Missouri's operating subsidiaries. (Ex. D at 46 to Pl.'s Br. Hickton.) ERAC-Missouri's operating subsidiaries refer to the contact center as "National Reservations" or "Nat Res." (Id. at 22.) The contact center also serves as the primary point of contact for ERAC customers needing roadside assistance. (Id. at 46.) The contact center's roadside assistance phone number is on every vehicle rental contract throughout the ERAC vehicle rental network. (Id. at 47-48.) The phone services and systems utilized by the contact centers are maintained by ERAC-Missouri's information technology ("IT") team. (Ex. E at 21 to Pl.'s Br. Hickton.)

ERAC-Missouri directly operates an IT division known as the e-commerce team. (Id. at 23.) The primary responsibility of the e-commerce team is to monitor and update the content on ERAC's network of websites, including enterprise.com, enterprise.ca, enterprise.code.uk, enterprise.de, and enterprisecarsales.com. (Id.) These websites allow customers to book a vehicle rental reservation or obtain information regarding vehicles for sale. (Id. at 83-84, 89-90.) The individual operating subsidiaries interact with the websites by informing the e-commerce team when a vehicle class is no longer available and should be removed from the website. (Id. at 34.)

When visiting an ERAC rental website such as enterprise.com, a potential customer can input a state, address, or zip code convenient to where they would like to rent a vehicle, along with the corresponding rental dates. (Ex. 7 at P0105 to Pl.'s Br. Averill.) The customer may select where the customer would prefer to pick-up a rental vehicle from a list of the nearest ERAC locations. (Id. at P0107.) After selecting a location, a list of that location's available vehicles and prices is presented. (Id. at P0119.) The customer may select a vehicle to hold for reservation, and input personal information such as name, phone number, and credit card information to hold the reservation. (Id. at P0120; Ex. J to Pl.'s Reply Hickton.) The rental is not complete, however, until the customer signs a ticket contract at the ERAC operating subsidiary's rental location and takes the vehicle. (Ex. E at 31 to Pl.'s Br. Hickton.)

When a customer completes a rental entry on enterprise.com, a vehicle is reserved. (Id.) The data from the enterprise.com reservation is sent to and stored in Missouri at ERAC-Missouri's data server facility. (Id. at 28.) A data retrieval system known as ECARS is used by each ERAC operating subsidiary to view the stored reservation data. (Id. at 29.) ECARS data is stored exclusively in Missouri until a rental ticket is created by an operating subsidiary's branch.

The ECARS system is also utilized for rentals booked through other avenues such as the contact center, the Automated Rental Management System ("ARMS"), which is a rental system used by auto body shops and insurance companies to provide vehicle reservations to their own customers through ERAC, and third-party booking channels such as Orbitz.com and Travelocity.com. (Id. at 25-26; 29-30.)

Enterprise Rent-A-Car's website is optimized to generate "hits" on search engines for users searching for rental cars in Chicago. (Ex. 21 ¶¶ 5-9 to Pl.'s Br. Averill.) Examples of optimization include the use of metatags and purchasing of sponsored listings on search engines. (Id.)

To promote the ERAC brand, ERAC-Missouri's marketing and communications division ("Mar Com") provides individual operating subsidiaries with marketing materials, and produces national advertisements. (Ex. I at 13 to Pl.'s Reply Hickton.) Marketing materials include locally targeted discounts for free upgrades, ten percent off standard daily rates, five percent off standard weekly rates, and one free weekend day. (Ex. I at E-005523, E-005524 to Pl.'s Br. Hickton.) To take advantage of the discounts, customers are directed to visit enterprise.com or call the toll free number to make a reservation. (Id.) Each advertisement contains ERAC-Missouri's trademarked Enterprise Rent-A-Car logo and does not mention any subsidiaries. (Id.)

Mar Com creates special discounts for use over the internet on the ERAC websites. (Ex. E at 58-59 to Pl.'s Br. Hickton.) These promotions are loaded into the websites by the National Reservations team at the contact center. (Id. at 62.) Each operating subsidiary can participate in the special discounts, or opt out on a branch-by-branch basis. (Id. at 61-63.)

ERAC-Missouri has an acquisition department. This department consists of a team of individuals that deals with the automobile manufacturers to acquire vehicles for the operating

subsidiaries.  (Pls.' App., Ex. 1 at 23.)  Although the acquisition department deals with manufacturers, the operating subsidiaries make the decisions about which vehicles will comprise their fleets.  (Def.'s App., Ex. 3 ¶ 15; Def.'s App., Ex. 4 ¶ 15; Def.'s App., Ex. 5 ¶ 15; Def.'s App., Ex. 6 ¶ 21; Def.'s App., Ex. 7 ¶ 15.)  Some operating subsidiaries have local acquisition personnel that negotiate and purchase vehicles in their local markets.  (Pls.' App., Ex. 1 at 23; Def.'s reply exhibit (Docket No. 164, Misc. No. 09-210), Ex. 26 at 107 ("I have my department that handles it locally is referred to as the Vehicle Acquisition Department. . . .  I negotiate what I'm going to pay the dealer here in Pittsburgh or in my market area.").)

ERAC-Missouri operates another corporate division called ERAC USA Fleet Services ("Fleet Services").  (Ex. B, at 85 to Pl.'s Br. Hickton.)  The primary function of Fleet Services is to collect various incentives received from vehicle manufacturers and redistribute them to ERAC operating subsidiaries.  (Id. at 85-86.)  When ERAC operating subsidiaries purchase the vehicles, the various incentives associated with group vehicle purchases are sent to Fleet Services and then distributed to the operating subsidiaries based upon the number of individual vehicle purchases.  (Id.)

ERAC-Missouri maintains an external job recruiting website, www.erac.com/recruit.  (Ex. 6 ¶ 2 to Pl.'s Br. Averill.)  Prospective employees select a part of the country where they would like to work.  (Ex. 8 at P0121 to Pl.'s Br. Averill.)  Available positions in the region are displayed, and prospective employees may submit an online application for a position or contact a local recruiter by calling the contact center.  (Id. at P0122-P0123; Ex. 6 at P0095-0104 to Pl.'s Br. Averill; Ex. 10 at P0137 to Pl.'s Br. Averill.)

The www.erac.com website is hosted by an unaffiliated third-party recruiting firm, TMP Worldwide.  (Def.'s Reply Averill, Ex. B ¶ 3.)  Users of www.erac.com can obtain information

about careers at all subsidiaries and at defendant parent. (Id.) If users wish to submit an employment application, they must follow a link to www.us-erac-icims.com, which is hosted by another unaffiliated third-party firm, iCIMS.com, Inc. ("iCIMS"). (Id. ¶ 4.) Before a user can submit an employment application, the user must indicate the city and state in which he or she would like to work. (Id. ¶ 5.) Completed applications are sent by iCIMS to the recruiting department of the appropriate operating subsidiary, which conducts all follow-up communication with the applicant. (Id.) The subsidiary makes the hiring decision without oversight or approval from ERAC-Missouri. (Id.) ERAC-Missouri is billed by iCIMS for the cost of maintaining the www.us-erac-icims.com site. ERAC-Missouri forwards these costs to the relevant operating subsidiary depending upon the number of applications that subsidiary receives. (Id. ¶ 7.)

ERAC-Missouri has a vice-president of customer service. That position is held by Dan Gass ("Gass"). Gass is responsible for overseeing a customer service evaluation program, known as the Enterprise Service Quality Index ("ESQI"). Customers of the operating subsidiaries are surveyed by a third-party company called Maritz, and Maritz forwards the results of the surveys to the operating subsidiaries. ESQI is used by the operating subsidiaries to evaluate customer satisfaction at their branch locations. (Pls.' App., Ex. 1 at 85-86.)

In addition to customer service evaluations, ERAC-Missouri distributes employee satisfaction surveys to the operating subsidiaries. (Pls.' App., Ex. 6 at 194-95.) A third-party facilitates the compilation of the results of the surveys. (Pls.' App., Ex. 1 at 177.) The results are disseminated to the operating subsidiaries from which the information came. (Id.) At least one operating subsidiary, however, creates and uses its own employee satisfaction survey. (Def.'s App., Ex. 5 ¶ 63.)

**C. Human Resources Services**

ERAC-Missouri directly operates a corporate human resources ("HR") department. (Ex. A, at 23-24 to Pl.'s Br. Hickton.) The HR department provides a variety of services to ERAC-Missouri's operating subsidiaries, including: a 401(k) plan and profit-sharing plan; best practices for hiring and selection of employees; general job descriptions; employee performance review forms; a suggested "management track" for employee advancement; recommended policies and programs, including paid time off policy, paternity leave policy, and breath alcohol testing program; and a compensation guide for employee salaries. (Id. at 21-23, 137-41, 220; Pl.'s App., Ex. 8; Pls.' App., Ex. 6 at 193-95.) Through the best practices and compensation guides, the HR department at ERAC-Missouri recommends which employees at operating subsidiaries should be salaried and which should receive hourly wages. (Ex. A at 295-96 to Pl.'s Br. Hickton.) The best practices guide provides: "The employee is the person (who is not a dependent) on whose behalf the plan is established. Employees include only the common-law employees of Enterprise." (Ex. 13 at P0181 to Pl.'s Br. Averill.) The guide also provides: "Information contained in the . . . Benefit Summary Plan Description refers to employees of: The Crawford Group, Inc., Enterprise Rent-A-Car Company and their various operating subsidiaries." (Ex. 13 at P0157 to Pl.'s Br. Averill.)

The HR department negotiates benefit plans with national providers to offer employees of defendant parent and the operating subsidiaries health insurance, life insurance, accidental death and dismemberment, and long-term disability coverage. (Ex. F ¶¶ 3, 4, 8 to Def.'s Reply Averill.) Benefits plans are developed by Dana Beffa, head of the corporate benefits department. (Pls.' App., Ex. 5, Adams Dep. Dec. 17, 2009 at 157.) Participation in the benefit plans is not required, but if employees of an operating subsidiary enroll, defendant parent will bill the

relevant operating subsidiary for the specific benefits elected. (Ex. F ¶¶ 6, 7, 9 to Def.'s Reply Averill.) Each employee can view his or her individual benefits by logging onto an employee website provided by defendant parent to all operating subsidiaries. (Ex. J at 23-24 to Pl.'s Reply Hickton.) The best practices guide, which provides information relevant to the benefits plans, states: "At their own discretion, each [operating subsidiary] may elect to provide other benefits specific to their employees and may elect to implement its own business practices and personnel policies unique to its operations and employees." (Def.'s App., Ex. 22 at E-002420.) With the exception of operating branches located in Hawaii and Puerto Rico, operating subsidiaries never offered benefits plans outside of those created by the HR department. (Pl.'s App., Ex. 5, Adams Dep. Dec. 17, 2009 at 157.)

The HR department compiles a list of available employment opportunities throughout the ERAC network. (Ex. A at 216 to Pl.'s Br. Hickton.) This list is available on ERAC-Missouri's email server and can be accessed by all employees of ERAC-Missouri and its operating subsidiaries. (Id.) If an employee transfers from one ERAC subsidiary to another, the HR department will assist in the employee relocation. (Id. at 218-19.) ERAC-Missouri has a centralized website, www.enterprise.com/eracpeople, that provides access to various information regarding benefits and retirement plans, as well as other company-related information. (Ex. 13 at P0165 to Pl.'s Br. Averill.)

When Edward Adams ("Adams") first started working at ERAC-Missouri's HR department, he developed practices for the hiring and selection of employees. (Ex. A at 23 to Pl.'s Br. Hickton; Pls.' App., Ex. 5, Adams Dep. Dec. 17, 2009 at 53-54.) He provided "insight into some best practices for those activities," (Ex. A at 23 to Pl.'s Br. Hickton), based upon a review of the practices being used by the operating subsidiaries (Pls.' App., Ex. 5, Adams Dep.

Dec. 17, 2009 at 53; Def.'s App., Ex. 2 ¶ 10).  In general, Adams would survey the practices

being used by the operating subsidiaries in a variety of ways, including telephone

communications, email communications, and in-person meetings.  (Pls.' App., Ex. 5, Adams

Dep. Dec. 17, 2009 at 54.)

Adams testified that defendant parent's HR department would develop job descriptions

for various positions utilized by the operating subsidiaries.  (Ex. A at 213 to Pl.'s Br. Hickton.)

Similarly, the HR department would develop dress codes for the various positions.  (See, e.g.,

Pls.' App., Ex. 7 at E-009705.)  The job descriptions included the general duties and

responsibilities for the positions.  (Ex. A at 213, 219-20 to Pl.'s Br. Hickton.)  Defendant parent

recommended salaries for these positions, and the salary recommendations were set forth in a

compensation guide.  (Id. at 219-20.)  The compensation guide's recommendations were based

upon "information from a variety of sources," including responses from operating subsidiaries or

suggestions from operating subsidiaries.  (Id. at 230.)  During his deposition, Adams stated that

defendant parent is involved in the classification of the operating subsidiaries' employees by

providing input to operating subsidiaries in the form of recommended compensation practices:

> Q.      . . . So we have a clean record, let me ask you the question
> again.  Does the parent have any involvement in recommending to
> the subsidiary or to any of the subsidiaries whether or not people
> holding the position of branch manager are exempt from the
> overtime laws?
>
> A.      The parent has input, yes.
>
> Q.      And how does the parent provide that input?
>
> A.      Well, through best practices based upon sharing with the
> sub once we, being the parent, have gotten information from the
> sub whether or not we believe that that is an exempt position or an
> hourly position.

Q.     And is that information conveyed in the compensation guide that the branch managers are – should be – are exempt?

A.     It is – it is identified as an exempt job.

Q.     Okay.

A.     It is not specifically conveyed as to why it is or how it became.

Q.     Okay.   Does the parent have any involvement in recommending to the subsidiaries whether or not people holding the title assistant branch managers are exempt from the overtime laws?

A.     It would be the same process with the branch manager.

Q.     Okay.  So your answer would be yes, they have – they have involvement, and the involvement is through the best practices – development of the best practices?

A.     Yes.

Q.     Okay.

A.     Input through the best practices.

(Id. at 295-96.)

Adams testified that he had conversations with employees of operating subsidiaries that wished to deviate from the compensation recommendations in the best practices guide:

Q.     Okay.  Ed, if there's a deviation from the compensation guide, is there a protocol for notifying the parent?

A.     Yes.

Q.     Okay.  What is that protocol?

A.     The protocol is that the parent would talk with the sub; and in most cases, it would be the sub initiating contact with the parent in order to discuss what the exception would be.

Q.     Okay.  And to whom does that conversation occur?

17

A.      In many cases, it occurs with the corporate vice president of group operations or senior vice president of group operations or myself.

Q.      Have you had conversations with operating subsidiaries in which they've conveyed to you that there's a – they have deviated from the compensation guide?

A.      I've had some conversations on some areas of the compensation guide, yes.

(Id. at 298.)  Adams asserted that the protocol for deviation was not formally stated:

Q.      Does the parent – is the parent made aware of when a sub chooses not to follow an individual practice as set forth in this guide?

A.      It might be.

Q.      Is there a protocol for ensuring the parent is made aware?

A.      Well, I think the protocol really is common courtesy to share with us if there's something that they're not doing, but I can't say that that always occurs.

Q.      Okay. Ed, is it my understanding that the parent company has approximately 50 or so, plus or minus a few, operating subsidiaries and that the only way it ensures that the business practice guide which it develops and disseminates the policies therein are followed or deviated from is through common courtesy of the individual subs?

A.      I think that's one of the ways, but what I'm saying is that they may call, they may not call.  So I can't always tell you whether people are contacted on that. It depends on the issue.

(Ex. 7 at 323 to Def.'s Br. Hickton.)

Robert Keyes ("Keyes"), vice president and general manager of Enterprise Leasing Company of Philadelphia, LLC, testified that he did not follow the recommendations with respect to compensation of certain employees:

A.      We have set up in our group a pay range that we would like to see folks achieve.  And if the business does not support that

within their commission structure we will put in place a non-standard plan so that they will get their – as an example, if we feel an assistant manager should be in the $40,000 pay range, yet the profits of the business don't support that, we would put something in place to allow them to achieve something near that $40,000 or exceed it.

Q.      Can you give me an example of what you would put in place to do that.

A.      Incentives, bonuses over and above just a percentage of the profits.

(Ex. 6 at 225-26 to Pls.' App.)  Keyes had conversations with Rick Allen ("Allen"), a vice president of his subsidiary, about the use of nonstandard pay plans, and Allen supported Keyes' decision.  (Id. at 226.)  Keyes used nonstandard pay plans for a variety of employees, including certain assistant branch managers.  (Def.'s App., Ex. 10 at 225.)

Adams testified that the ultimate decision to classify a position as exempt was up to the operating subsidiary:

A.      . . . We would recommend to the subs that these are exempt positions.

Q.      Okay.

A.      *It is for them to decide.*

Q.      To your knowledge, do any of the subsidiaries pay – despite the recommendations made in the compensation guide, pay assistant branch managers on an hourly basis?

A.      Yes.

Q.      Okay. To your knowledge, are the – are those locations within California?

A.      To the best of my knowledge, they're in California.

Q.      Okay. To your knowledge, do any of the subsidiaries outside of California pay assistant branch managers on an hourly basis?

A.      I'm not aware of any.

Q.      Okay. To your knowledge, despite the recommendation in the compensation guide, do any operating subsidiaries pay branch managers on an hourly basis?

A.      I'm not aware of any.

Q.      Okay. And that's both within California, outside of California?

A.      That is correct.

(Id. at 297 (emphasis added).)

In 2005, Adams attended a meeting at which ERAC-Missouri's in-house counsel and general managers of the operating subsidiaries were present. (Pls.' App., Ex. 5, Adams Dep. Dec. 17, 2009 at 90.) At that meeting, Adams communicated his recommendation – which was later memorialized in the best practices guides – that assistant branch managers outside of California should be classified as exempt. (Id. at 89 ("The job title of assistant branch manager outside of California was recommended to be exempt, and we shared that with the individual subs.").) With respect to the subsidiaries operating branch locations in California, Adams testified:

A.      . . . I do not determine what [the activities and job responsibilities] would be for that assistant branch manager in California.
        All I can do is tell you as I have generally that they would not have employees reporting to them and that their responsibilities would not include the kind of judgment and problem solving that we have in the other 49 states.
        But I can't tell you specifically what they do. Nor could I tell you specifically what any individual would do. That would be the general manager in that particular sub.

        . . . .

Q. Well, you would still ultimately be responsible for giving recommendations to California as to the classification of the employees in the branch locations as exempt or nonexempt. Correct?

. . . .

A. . . . I would – if asked, I could make a recommendation based upon an understanding of what their job responsibilities are today in a particular sub. But I don't know what they do and I never was an assistant branch manager, nor have I examined the assistant branch manager job in order to determine what they're doing today.

. . . .

Q. Well, it's accurate to say that in your position you are overseeing corporate HR with respect to recommendations that go out to subsidiaries regarding the classification of the job positions in the subsidiaries as exempt or nonexempt. Correct?

A. That is correct.

Q. That includes California?

A. That includes California.

Q. So someone within corporate HR needs to have an understanding of what the job duties and responsibilities are for the positions in order to give those recommendations. Correct?

A. Someone in corporate may have an idea of – well, in fact someone in corporate may have been a part of developing a job description for California.
But once it's provided to California, it's up to those individual subs to determine what in fact they're going to do of that general nature type of an assistant branch manager job.

(Pls.' App., Ex. 5, Adams Dep. Dec. 17, 2009 at 94-95.)

The best practices guide is sent to all full-time employees of defendant parent and the

operating subsidiaries. (Ex. A at 334-35 to Pl.'s Br. Hickton.) Adams testified that defendant

parent's HR department provides assistance to employees of all operating subsidiaries, and this

assistance includes the ability to participate in the retirement savings plan and 401(k) plan. (Id. at 21-23.) The HR department does not maintain personnel files for the operating subsidiaries' branch managers or assistant branch managers. (Def.'s App., Ex. 2 at ¶ 21.)

Adams testified that he could recall at least one individual who went from a corporate vice president position at defendant parent to a vice president or general manager position at a subsidiary, and he believed that such position changes have happened more than once. (Ex. A at 58 to Pl.'s Br. Hickton.) He stated that "at virtually any point in [their] career," a person can move from a corporate position at defendant parent to a position at an operating subsidiary. (Id. at 141.) The operating subsidiaries do not have an arrangement to interchange their branch managers or assistant branch managers with ERAC-Missouri or each other. (Def.'s App., Ex. 3 ¶ 76; Def.'s App., Ex. 4 ¶ 79; Def.'s App., Ex. 5 ¶ 78; Def.'s App., Ex. 6 ¶ 73; Def.'s App., Ex. 7 ¶ 77.)

The HR department provides training and direction to management level employees of the operating subsidiaries. (Ex. F ¶ 33, 52-53 to Pl.'s Reply Hickton.) ERAC-Missouri's corporate training department has approximately twenty employees and develops best practices for training that are distributed to the operating subsidiaries. (Pls.' App., Ex. 5, Adams Dep. Dec. 17, 2009 at 31.)

Another ERAC-Missouri division related to the HR department is the employee communications division. (Ex. A at 50 to Pl.'s Br. Hickton.) The primary responsibility of the employee communications division is to communicate about the Enterprise brand. (Id. at 51.) Those communications encompass a wide range of issues affecting the ERAC network. (Id. at 50.) ERAC-Missouri sends magazines to employees of the subsidiaries on a quarterly basis. (Ex. 14 ¶ 7 to Pl.'s Br. Averill.)

ERAC-Missouri maintains a toll-free hotline for employees to voice concerns that they do not wish to raise with their direct superiors at an operating subsidiary.  (Ex. B at 338 to Pl.'s Reply Hickton.)  Messages on the hotline are received and addressed by business managers within ERAC-Missouri.  (Id. at 338.)  The same concerns can also be reported directly to the HR department.  (Id. at 337.)

### D. ERAC-Missouri's Contacts in Pennsylvania and Illinois

ERAC-Missouri alleges that it is not registered with the Secretary of State of Pennsylvania or Illinois for the purpose of conducting business in either Pennsylvania or Illinois and does not have agents for service of process in those jurisdictions.  (Ex. 1 ¶ 6 to Def.'s Br. Hickton; Ex. D ¶ 7 to Def.'s Br. Averill.)  ERAC-Missouri, however, on July 30, 2008 – approximately eight months after the action in Pennsylvania was commenced – filed a certificate of authority with the Pennsylvania Secretary of State stating that it is an active foreign business corporation providing "administrative services."  (Ex. A to Pl.'s Reply Hickton.)  The filing states it is "perpetual," and was on file as of May 5, 2009.  (Id.)  ERAC-Missouri asserts that the filing resulted from an error and on June 1, 2009, withdrew the filing.  (Notice of Correction (Docket No. 96, Civ. No. 07-1687), Exs. A, B.)

ERAC-Missouri registered the "e and design" service mark with the Illinois Secretary of State in 1969 for use with "services in connection with the sale and leasing of automobiles," which registration expired on December 31, 2009.  (Ex. 2 at P0017 to Pl.'s Br. Averill.)  ERAC-Missouri registered the "executive" service mark with the Illinois Secretary of State in 1997 for use with "vehicle renting and leasing services," which registration will expire on August 12, 2012.  (Id. at P0018.)

In August 2004, ERAC-Missouri initiated a lawsuit against Collision Industry Management Solutions in the United States District Court for the Northern District of Illinois. (See Ex. 1 to Pl.'s Br. Averill.) The lawsuit claimed that Collision Industry Management Solutions infringed ERAC-Missouri's trademarks registered with the United States, when Collision Industry Management Solutions created a system offering a similar service to Enterprise Rent-A-Car's ARMS system and called it by the same name. (Id. at P0001-P0003.) In the complaint, defendant parent alleged:

> Enterprise is a Missouri corporation with a principal place of business at 600 Corporate Park Drive, St. Louis, Missouri 63105.
>
> . . . .
>
> Enterprise operates a large number of locations in the Northern District of Illinois. Both Enterprise and [the defendant] conduct business in the Northern District of Illinois, including the offering of their respective ARMS services and computer programming.

(Id. at P0002.)


### E. Boards of Directors of ERAC-Missouri's Operating Subsidiaries

At the time the complaints were filed, the board of directors at every operating subsidiary was comprised of directors from ERAC-Missouri. (Ex. H at 175 to Pl.'s Reply Hickton.) Andrew C. Taylor ("Taylor"), Pamela Nicholson ("Nicholson"), and William W. Snyder ("Snyder") are members of ERAC-Missouri's board of directors, and they also serve as executive officers for ERAC-Missouri. (Ex. B at 79 to Pl.'s Br. Hickton; Pls.' App., Ex. 2 at 14.) Those three individuals served on the three-person boards of directors of all operating subsidiaries.[9] (Id. at 175.) In Nicholson's biography she represents that she oversees the efforts

---

[9] Since the briefing on the motions to dismiss was filed, the subsidiaries converted from corporations to limited liability companies. (See Pls.' App., Ex. 15.) The briefing and discovery with respect to the motion for summary

of 68,000 employees, and in Snyder's biography he represents that he has overall responsibility for more than 68,000 employees. (Pls.' App., Exs. 10, 11.) In Taylor's biography he similarly represents that "Enterprise Holdings has a fleet of more than one million vehicles and 68,000 employees." (Pl.'s App., Ex. 16.)

As members of the boards of directors of the operating subsidiaries, Taylor, Nicholson, and Snyder collectively had the power, on behalf of an operating subsidiary, by majority vote to do all things necessary or convenient to carry out the business and affairs of the operating subsidiary.[10] (See Pls.' App., Ex. 3.[11])

---

judgment occurred after the conversions. Taylor, Nicholson, and Snyder approved these conversions in their capacities as directors of the operating subsidiaries. (See, e.g., Pls.' App., Ex. 3 at E-035667.) After the conversions, Taylor, Nicholson, and Snyder served as the three managers of each limited liability company ("LLC managers"). (See C.S.F. ¶ 82; Pls.' App., Ex. 2 at 22, 39.) LLC managers can be granted more direct control over the operations of a limited liability company than directors of a corporation over the operations of a corporation, because limited liability companies are permitted to use an informal management structure modeled on agency law (which also applies to partnerships). THOMAS A. HUMPHREYS, LIMITED LIABILITY COMPANIES AND LIMITED LIABILITY PARTNERSHIPS § 4.02 (2009). There is evidence that as managers of the limited liability companies, Taylor, Nicholson, and Snyder were bestowed somewhat greater powers than they had as directors of the corporations. (See Pls.' App., Ex. 6 at 232-33.) The court in this opinion will consider the powers and authorities held by Taylor, Nicholson, and Snyder in their capacities as directors, because no named plaintiff was employed by an operating subsidiary after it converted to a limited liability company. (See Hr'g Tr. June 7, 2010 at 7-8.)

[10] A board of directors has the power to carry out the business of the corporation:

> Under most statutes, the directors are entrusted with the control and management of the business of the corporation. This empowers the directors to do whatever is necessary to manage the ordinary business of the corporation, subject to any express restrictions in the charter, bylaws, or the general law. The directors possess this authority without consulting with or obtaining the consent of the shareholders.

> A corporation does not act through its individual directors as a whole. An individual director has no authority to take action on behalf of the corporation without the consent of the board of directors.

2 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 505 (perm. ed. rev. vol. 2006).

[11] After the conversion to limited liability companies, the LLC managers of the operating subsidiaries had, inter alia, the following powers:

> (1) the power to elect the officers of an operating subsidiary, including a president, one or more vice presidents, a secretary, and a treasurer;

> (2) to sell, transfer, or acquire property of an operating subsidiary;

The boards of directors of the operating subsidiaries delegated the vast majority of their authority to the operating subsidiaries' management personnel, and principally to their general managers. (See Def.'s App., Ex. 1 ¶ 33; Def.'s App., Ex. 2 ¶ 3; Def.'s App., Ex. 3 ¶¶ 23-25; Def.'s App., Ex. 4 ¶¶ 23-25; Def.'s App., Ex. 5 ¶¶ 23-25; Def.'s App., Ex 6 ¶¶ 11, 27-28; Def.'s App., Ex. 7 ¶¶ 23-25.) In particular, they delegated the power to sell, transfer, or purchase property. In accordance with this delegation of power, Keyes, vice president and general manager of Enterprise Leasing Company of Philadelphia, LLC, testified he made the decision to purchase a rental office location. (Pls.' App., Ex. 6 at 121.) Timothy Nettles ("Nettles"), the vice president and general manager of ERAC-Pittsburgh, testified that he "worked out a deal" to transfer two branch locations to another operating subsidiary. (Def.'s reply exhibit, Ex. 26 at 11.) The boards of directors delegated the power to hire or fire branch managers and assistant branch managers of each operating subsidiary to that subsidiary's management personnel. (Def.'s App., Ex. 1 ¶ 33.) General managers can earn annual compensation ranging from the mid-six figures to upper-seven figures. (Def.'s App., Ex. 2 ¶ 4; Def.'s App., Ex. 9 at 14-16.)

---

(3) to lend an operating subsidiary's money, to invest the funds of an operating subsidiary, and to receive and hold property of an operating subsidiary as security for repayment;

(4) to open bank accounts and designate the number and identity of the individuals authorized to write checks and make withdrawals of funds on an operating subsidiary's behalf;

(5) to designate a replacement registered agent or file a change of registered office for an operating subsidiary;

(6) to pay, collect, compromise, arbitrate, prosecute, or defend legal actions with respect to an operating subsidiary;

(6) to participate in any joint ventures on behalf of an operating subsidiary;

(7) to hire or terminate the employment of any officer or employee of the operating subsidiary.

(Pls.' App., Ex. 3.) Brian Mogauro, vice president and general manager of Enterprise Leasing of Orlando, LLC, testified that Taylor, Nicholson, and Snyder had all the powers listed in the operating subsidiary's limited liability company agreement. (Pls.' App., Ex. 4 at 137.) There is no corporate document or testimony by a member of the board of directors, however, that a board of directors had these direct powers.

**F. Characteristics of ERAC-Missouri's Operating Subsidiaries**

Matthew Darrah, who serves as ERAC-Missouri's executive vice president of North America, testified that ERAC-Missouri's performance is related to the performance of the operating subsidiaries:

> Q.      Do you agree that the work of the employees at the branch locations is integral to the performance of the parent company Enterprise?
>
> A.      If the subsidiaries don't do well, yeah, the entire, yeah, company doesn't do well.  The entity doesn't do well.
>
> Q.      So is the answer to the question yes?
>
> A.      Yes.

(Pls.' App., Ex. 1 at 104.)

The operating subsidiaries hire, promote, discipline, and fire their own branch managers and assistant branch managers.  (Def.'s App., Ex. 2 ¶ 7; Def.'s App., Ex. 3 ¶¶ 30, 32-33; Def.'s App., Ex. 4 ¶¶ 30, 32-33; Def.'s App., Ex. 5 ¶¶ 30, 32-33; Def.'s App., Ex. 6 ¶¶ 30-31, 34-35; Def.'s App., Ex. 7 ¶¶ 30, 32-33.)  For example, Keyes, vice president and general manager of Enterprise Leasing Company of Philadelphia, LLC, testified that in "my 24-and-a-half years with the company there has never been any precedent" of involvement of any person from ERAC-Missouri in his decisions to hire or fire employees of the operating subsidiaries.  (Def.'s App., Ex. 10 at 240-41.)  Although Taylor, Nicholson, and Snyder were the only members of the boards of directors and as board members could vote on various matters affecting the operating subsidiaries, they did not participate in hiring or firing branch managers or assistant branch managers.  (Def.'s App., Ex. 3 ¶ 36; Def.'s App., Ex. 4 ¶ 36; Def.'s App., Ex. 5 ¶ 36; Def.'s App., Ex. 6 ¶ 38; Def.'s App., Ex. 7 ¶ 36; Def.'s App., Ex. 11 at 129-30.)  Brian Mogauro ("Mogauro"), vice president and general manager of Enterprise Leasing of Orlando, LLC,

testified that Taylor, Nicholson, and Snyder "were never involved in my – in that process in Orlando," and any potential they possess for interjecting in that process is inconsequential because such interjection is "out of the norm of reality." (Def.'s App., Ex. 11 at 130-32.) The operating subsidiaries review the performance of their branch managers and assistant branch managers. (Def.'s App., Ex. 2 ¶ 8; Def.'s App., Ex. 3 ¶ 31; Def.'s App., Ex. 4 ¶ 31; Def.'s App., Ex. 5 ¶ 31; Def.'s App., Ex. 6 ¶ 33; Def.'s App., Ex. 7 ¶ 31.) Keyes testified that in order to assess the performance of assistant branch managers at his operating subsidiary, he utilized an annual review form created by ERAC-Missouri. (Pls.' App., Ex. 6 at 93-94.)

The operating subsidiaries decide where they will open and operate branches. (Def.'s App., Ex. 3 ¶ 45; Def.'s App., Ex. 4 ¶ 46; Def.'s App., Ex. 5 ¶ 46; Def.'s App., Ex. 6 ¶ 46; Def.'s App., Ex. 7 ¶ 46.) The operating subsidiaries decide the days and hours that their branches will be open for business. (Def.'s App., Ex. 3 ¶ 46; Def.'s App., Ex. 4 ¶ 47; Def.'s App., Ex. 5 ¶ 47; Def.'s App., Ex. 6 ¶ 49; Def.'s App., Ex. 7 ¶ 47.) The operating subsidiaries decide when their employees will be moved from one branch location to another. (Def.'s App., Ex. 3 ¶ 48; Def.'s App., Ex. 4 ¶ 49; Def.'s App., Ex. 5 ¶ 49; Def.'s App., Ex. 6 ¶ 51; Def.'s App., Ex. 7 ¶ 49.) The operating subsidiaries decide which days and hours their branch managers and assistant branch managers will work at the assigned branch locations. (Def.'s App., Ex. 3 ¶ 49; Def.'s App., Ex. 4 ¶ 50; Def.'s App., Ex. 5 ¶ 50; Def.'s App., Ex. 6 ¶ 52; Def.'s App., Ex. 7 ¶ 50; Def.'s App., Ex. 10 at 135.)

The operating subsidiaries set the compensation for their branch managers and assistant branch managers. (Def.'s App., Ex. 3 ¶ 37; Def.'s App., Ex. 4 ¶ 37; Def.'s App., Ex. 5 ¶¶ 37, 39; Def.'s App., Ex. 6 ¶ 39; Def.'s App., Ex. 7 ¶ 37.) The operating subsidiaries determine whether branch managers and assistant branch managers are classified as exempt from the FLSA

overtime provisions.  (Def.'s App., Ex. 3 ¶ 42; Def.'s App., Ex. 4 ¶ 43; Def.'s App., Ex. 5 ¶ 43; Def.'s App., Ex. 6 ¶ 45; Def.'s App., Ex. 7 ¶ 43; Def.'s App., Ex. 12 at 34-35.)  Keyes testified at his deposition that if he wanted to change the classification of assistant branch managers working for his operating subsidiary from exempt from receiving overtime to nonexempt, he would consult Allen.  (Def.'s App., Ex. 10 at 206-07.)  Mogauro at his deposition was asked, "Who made the determination that assistant managers would be exempt under the [FLSA] for the Orlando group?"  (Def.'s App., Ex. 11 at 78.)  Mogauro responded, "I can only speak for since I've been here.  Me."  (Id.)  The operating subsidiaries' classifications of assistant branch managers are consistent with the recommendations of ERAC-Missouri.  (See C.S.F. ¶ 109.)  While ERAC-Missouri creates and distributes job descriptions for assistant branch managers, the operating subsidiaries may or may not use these descriptions.  For example, Nettles testified that he does not use the recommended job descriptions.  (Def.'s App., Ex. 26 at 179.)

The operating subsidiaries elected to adopt many of the policies recommended by ERAC-Missouri.  (Def.'s App., Ex. 3 ¶ 53; Def.'s App., Ex. 4 ¶ 54; Def.'s App., Ex. 5 ¶ 54; Def.'s App., Ex. 6 ¶¶ 55–56; Def.'s App., Ex. 7 ¶ 52.)  For example, Mogauro uses within his operating subsidiary a form consent agreement regarding drug testing that was provided by ERAC-Missouri.  (Pls.' App., Ex. 4 at 123.)  When Mogauro was asked if he expects employees who work at his operating subsidiary to comply with the policies recommended by ERAC-Missouri, he answered, "I would expect the employees in Orlando to adopt the policies that I set for Orlando."  (Def.'s App., Ex. 11 at 55.)  Keyes testified that when a recommended policy "came in I would sit down with my HR manager and say, yes, this is something we are going to choose."  (Pl.s' App., Ex. 6 at 194.)  The operating subsidiaries may decide to vary from ERAC-

Missouri's recommended policies. (Def.'s App., Ex. 2 ¶ 16; Def.'s App., Ex. 3 ¶ 54; Def.'s App., Ex. 4 ¶¶ 55–56; Def.'s App., Ex. 5 ¶ 54; Def.'s App., Ex. 6 ¶ 55; Def.'s App., Ex. 7 ¶ 55.)

With respect to training materials, the operating subsidiaries may use the materials provided by ERAC-Missouri. (Def.'s App., Ex. 2 ¶ 18; Def.'s App., Ex. 3 ¶ 57; Def.'s App., Ex. 4 ¶ 58; Def.'s App., Ex. 5 ¶ 57; Def.'s App., Ex. 6 ¶ 57; Def.'s App., Ex. 7 ¶ 58.) The operating subsidiaries tailor the training they provide the employees who work at their branch locations, in order to suit the operating subsidiaries' particular strategies and to best meet the unique needs of their businesses, clients, and locations. (Def.'s App., Ex. 3 ¶ 58; Def.'s App., Ex. 4 ¶ 59; Def.'s App., Ex. 5 ¶¶ 57–58; Def.'s App., Ex. 6 ¶¶ 57–58; Def.'s App., Ex. 7 ¶ 59.) Training sessions for assistant branch managers are held locally by the operating subsidiaries, and the training sessions are staffed by employees of the operating subsidiaries. (Def.'s App., Ex. 3 ¶ 59; Def.'s App., Ex. 4 ¶ 60; Def.'s App., Ex. 5 ¶¶ 59–61; Def.'s App., Ex. 6 ¶¶ 59–60; Def.'s App., Ex. 7 ¶ 60.) Newly-hired branch managers are invited to attend a single national meeting with other newly-hired branch managers from operating subsidiaries around the country, but assistant branch managers attend no such meetings. (Def.'s App., Ex. 3 ¶¶ 59-60; Def.'s App., Ex. 4 ¶¶ 60–62; Def.'s App., Ex. 5 ¶¶ 59–60; Def.'s App., Ex. 6 ¶¶ 59–60; Def.'s App., Ex. 7 ¶¶ 60-61.)

The sample plaintiffs[12] deposed in this case did not physically work at ERAC-Missouri's headquarters. (Def.'s App., Ex. 14 at 46-47; Def.'s App., Ex. 15 at 99-100; Def.'s App., Ex. 16 at 28-29; Def.'s App., Ex. 17 at 135; Def.'s App., Ex. 18 at 340; Def.'s App., Ex. 19 at 11-12; Def.'s App., Ex. 20 at 140-43.) Bajkowski, who worked as an assistant branch manager for

_____

[12] On September 11, 2009, this court entered a discovery order that governed discovery with respect to joint employer issues. (Docket No. 29, Misc. No. 09-210.) The ordered provided: "There may be up to ten sample plaintiffs for this stage of discovery. The defendants may identify up to four sample plaintiffs (other than Plaintiff Hickton). The plaintiffs may identify up to five additional sample plaintiffs." (Id.) The following individuals were selected as sample plaintiffs: Robert Bajkowski ("Bajkowski"); Joseph Biski ("Biski"); Wayman F. Graham, II ("Graham"); Kevin C. Hagler ("Hagler"); Nils Hagstrom ("Hagstrom"); Melinda McQuaig; Kimberly Rickman; Brandon Singleton ("Singleton"); and Hickton. (See Docket No. 91 ¶ 6.)

ELC-Chicago, testified that the only direction he took from someone in corporate headquarters was during a training session.  (Def.'s App., Ex. 13 at 52-53.)   Biski, who worked as an assistant branch manager at a branch in Schenectady, New York, testified that he was unaware of anyone from corporate headquarters evaluating performance, commenting on performance reviews, or conducting an interview.  (Def.'s App., Ex. 14 at 36, 40, 296-98.)  Graham, who worked as an assistant branch manager at branches in Miami, Florida, testified that he understood his employment was with the subsidiary, not ERAC-Missouri.  (Def.'s App., Ex. 15 at 96-100.) Hagler, who worked as an assistant branch manager at a branch in Tuscaloosa, Alabama, testified that he "assumed [he] was employed by Enterprise Leasing Company South Central," not ERAC-Missouri.  (Def.'s App., Ex. 16 at 28-29.)  Hagstrom, who worked as an assistant branch manager at branches in New York, New York, and Singleton, who worked as an assistant branch manager for ELC-Chicago, testified that they never had contact with anyone from ERAC-Missouri during their employment.  (Def.'s App., Ex. 17 at 87-88; Def.'s App., Ex. 21 at 93, 95.) Hickton, who worked as an assistant branch manager for ERAC-Pittsburgh, testified that he did not have contact with anyone from ERAC-Missouri during his hiring or promotion processes, and he indicated on job applications that his employer was "Enterprise Rent-A-Car Company of Pittsburgh."  (Def.'s App., Ex. 18 at 22-23, 82-83, 120, 132-33, 180, 186-87.)

ERAC-Missouri has the authority to enter into nationwide rental agreements that provide for car rental rates for certain customers.  Darrah, ERAC-Missouri's executive vice president of North America, testified about these contracts:

> Q.      You would want to make sure that Atlanta had sufficient vehicles to be able to service the demand?
>
> A.      Sufficient vehicles, sufficient operating space, space at airports is finite.  You have to really watch the amount of business you bring on in

some cases because it might be too much, believe it or not. But that is reality.

Q.      Are there national sales contracts actually signed between the parties?

A.      Oh, sure, yes.

Q.      Who signs on behalf of Enterprise?

A.      It would depend on the size of the account.

Q.      What about somebody like IBM?

A.      For somebody for like IBM, probably Brad Carr who you mentioned earlier. But for a small to medium size business, it would be somebody at the local group.

Q.      Would Mr. Carr also be the one who would sign the contract for Enterprise with Siemens?

A.      Yeah, more than likely.

Q.      Would Mr. Carr be the one to negotiate any of the particular terms and conditions of those contracts with the customers?

A.      He would be the one that would gather the information, would communicate with the groups that would be impacted by signing a customer that size, would get a – sign off on the rates and revenue that would be generated from that account, yes.

Q.      As part of those national sales accounts, those customers would get special rates; is that correct?

A.      Would they get special rates? They would get rates – it just depends. There may be different rates and different markets based on the cost of doing business in those markets.

Q.      Well, they would get preferred rates or preferred terms that they would not get if they had not entered into the contract, correct?

A.      There would certainly be some consideration for volume that would make the rates better for sure, yeah.

> Q.     Then once Mr. Carr signs off on those contracts, the specific branch locations that are effected would have to comply with the rates or the provisions of those contracts, correct?
>
> A.     They would have given their blessing, if you will, that go ahead and sign that up and I'll handle it.
>
> Q.     Okay.   And I think I asked you before, are you aware of any branch locations that ever refused to agree to entering into a National account or servicing a national account?
>
> A.     Could I come up with one?   No.   Certainly not after one was signed, no.   But prior to one being signed, there may have been instances where an operating group said, you know, that's probably not a good idea for us.
>
> Q.     Can you give me a specific example?
>
> A.     I can't off the top of my head.   I can tell you we fought long and hard about it in the Atlanta market with IBM.   As much as we wanted that piece of business, we were concerned about whether or not we could handle it in that market.   The local GM was concerned about whether or not they could handle the volume.

(Pls.' App., Ex. 1 at 123-25.)  When asked whether his operating subsidiary was required to comply with nationwide contracts, Keyes testified "not necessarily," although he explained that he never rejected a nationwide contract because he found them all lucrative to his subsidiary. (Pls.' App., Ex. 6 at 154-55.)

With respect to the nationwide contracts, Mogauro testified as follows:

> Q.     Number two refers to location participation; correct?
>
> A.     Yes, I see it.
>
> Q.     According to that first statement under location participation, "All locations are required to honor the rates contained in this agreement."
>        Do you see that?
>
> A.     Yes.

Q.   Would it be your understanding that Enterprise Orlando would be required to honor the rates contained in this agreement?

. . . .

A.   My understanding – I would want this business in Orlando.

. . . .

Q.   That wasn't exactly the question.  You would comply with the terms of this agreement; correct?

A.   I would adopt the terms of the agreement and appreciate the business.

Q.   When you say adopt, what do you mean?

A.   I would adopt and grant cars to this particular company that has these rates.

Q.   You would comply with the terms of the agreement?

A.   I wouldn't say comply.  I would say I would rent cars to the people based on this agreement.

Q.   According to the terms of this agreement?

A.   Correct.

(Pls.' App., Ex. 4 at 103-04.)

With respect to the management hierarchy structure followed by the operating subsidiaries, assistant branch managers report to branch managers, and branch managers report to area managers. (C.S.F. ¶¶ 51, 53.)  Area managers report to employees who work solely for the operating subsidiaries.  The titles held by those employees vary depending on how the particular operating subsidiary decides to structure its own management.  (C.S.F. ¶ 55.)  For example, area managers working at branch locations operated by Enterprise Leasing Company of Philadelphia, LLC report to regional vice presidents.  (Def.'s App., Ex. 3 ¶ 66.)  Similarly, area managers working at branch locations operated by Enterprise Leasing Company –South Central,

LLC report to regional vice presidents, although they used to report to regional managers. (Def.'s App., Ex. 4 ¶ 69.) Bruce McKee, general manager and president of Enterprise Leasing Company – South Central, LLC made the decision to reorganize management structure within his subsidiary. (Id.) In contrast, area managers working at branch locations operated by Enterprise Leasing Company of Orlando, LLC report to group rental managers. (Def.'s App., Ex. 5 ¶ 68.) All employees of the operating subsidiaries ultimately report to general managers. (Def.'s App., Ex. 3 ¶ 67; Def.'s App., Ex. 4 ¶¶ 25, 70; Def.'s App., Ex. 5 ¶¶ 25, 69; Def.'s App., Ex. 6 ¶¶ 11, 64; Def.'s App., Ex. 7 ¶ 68.)

With respect to the reporting obligations of the general managers, Keyes testified that he reports to Allen, who is the "[s]enior vice president." (Pls.' App., Ex. 6 at 36.) Keyes testified as follows:

> Q.      . . . what is your understanding of what the role is of the three individuals who are the managers of the LLC?
>
> A.      To make sure I am doing my job.
>
> Q.      Do you ever report to Mr. Taylor, Ms. Nicholson and Mr. Snyder, the three of them together, in their role as the managers of the LLC?
>
> A.      My immediate supervisor is Rick Allen.
>
> Q.      And by that answer, what do you mean? I had asked you whether you ever report to those three together?
>
> A.      Then, no.
>
> Q.      So is it your understanding that you report to Mr. Allen and he reports to those three individuals in their role as managers of the LLC?
>
> A.      Yes.
>
> Q.      As managers of the LLC, is that another part of their responsibilities that they have a chairman of the holding company

for Mr. Taylor, and as COO for Ms. Nicholson and CFO for Mr. Snyder?

A.      Yes.

(Id. at 167-68.)  Allen is the vice president of a number of the operating subsidiaries.  (See Def.'s App., Ex. 3 ¶ 22; Def.'s App., Ex 6 ¶ 26; Def.'s App., Ex. 7 ¶ 22.)  Operating subsidiaries prepare and send monthly financial reports to ERAC-Missouri that contain, among other things, information regarding fleet size, profits, costs, and expenses.  (C.S.F. ¶ 96; Pls.' App., Ex. 4 at 71-72; Pls.' App., Ex. 6 at 112-13.)

The operating subsidiaries contract directly with outside payroll services to process paychecks for their employees.  (Def.'s App., Ex. 3 ¶ 72; Def.'s App., Ex. 4 ¶ 75; Def.'s App., Ex. 5 ¶ 74; Def.'s App., Ex. 6 ¶ 69; Def.'s App., Ex. 7 ¶ 73.)  The operating subsidiaries draw from their own bank accounts to compensate their branch managers and assistant branch managers.  (Def.'s App., Ex. 3 ¶ 71; Def.'s App., Ex. 4 ¶ 74; Def.'s App., Ex. 5 ¶ 73; Def.'s App., Ex. 6 ¶ 68; Def.'s App., Ex. 7 ¶ 72.)  ERAC-Missouri plays no role in the payroll process used by the majority of the operating subsidiaries for branch managers and assistant branch managers.  (Def.'s App., Ex. 2 ¶ 22.)  ERAC-Missouri provides a shared payroll service to four of its smaller operating subsidiaries, which are located in (1) Missouri, (2) Hawaii, (3) Harrisburg, Pennsylvania, and (4) a combination of North Dakota, South Dakota, and Montana.  (Id.)  These four operating subsidiaries pay a special fee for the payroll service.  (Id.)  In addition to the services provided to the operating subsidiaries by ERAC-Missouri's HR department, the subsidiaries maintain their own human resources departments.  (Def.'s App., Ex. 3 ¶ 68; Def.'s App., Ex. 4 ¶ 71; Def.'s App., Ex. 5 ¶ 70; Def.'s App., Ex. 6 ¶ 65; Def.'s App., Ex. 7 ¶ 69; Def.'s App., Ex. 10 at 34-36; Def.'s App., Ex. 11 at 35, 129; Def.'s App., Ex. 12 at 15, 81, 115-116.)

The members of the boards of directors of the operating subsidiaries voted on several matters, such as the declaration of dividends. (Pls.' App., Ex. 2 at 35-36; Pls.' App., Ex. 4 at 89-90; Pl.'s App., Ex. 6 at 166.) General managers of the subsidiaries did not necessarily track the dividends that their boards of directors would select. For example, Keyes did not see a document stating the amount of a quarterly dividend paid on November 17, 2008. (Pls.' App., Ex. 6 at 170.) Although that kind of document is available to Keyes, he never attempted to obtain one. (Id. at 171.)

## G. ERAC-Pittsburgh

At the time the complaint was filed, ERAC-Pittsburgh was incorporated under Pennsylvania law and was registered to conduct business in Pennsylvania. (Ex. 4 ¶ 3 to Def.'s Br. Hickton.) It is wholly owned by ERAC-Missouri, and, as an operating subsidiary, it primarily rents vehicles. (Id. ¶ 4.) Both ERAC-Missouri and ERAC-Pittsburgh observed corporate formalities, had separate articles of incorporation and bylaws, and filed separate annual reports. (Id. ¶ 5.) ERAC-Pittsburgh maintains a corporate headquarters in Pittsburgh, Pennsylvania. (Id. ¶ 8.)

Nettles is the vice-president and general manager of ERAC-Pittsburgh. (Ex. 3 ¶¶ 2, 5 to Def.'s Br. Hickton.) Nettles makes the operational decisions for ERAC-Pittsburgh. (Id. at ¶ 5.) Under Nettles' supervision, ERAC-Pittsburgh builds and maintains a car rental business. (Id. ¶ 7.) ERAC-Pittsburgh selects its branch locations, rents office space, chooses which vehicles to buy, and formulates its own strategies to capture the Pittsburgh car rental market. (Id. ¶ 8.) Subject to Nettles' authorization, ERAC-Pittsburgh's management sets operating hours, establishes sales and rental prices (except for national accounts), processes payroll, maintains

financial records and bank accounts, and makes employment decisions. (Id. at ¶ 9; Ex. 4 ¶ 12 to Def.'s Br. Hickton.) Nettles is required to attend two meetings a year at ERAC-Missouri's offices in St. Louis. (Ex. D at 191 to Pl.'s Reply Hickton.) ERAC-Missouri recommends best practices for operating subsidiaries and branch locations, to which ERAC-Pittsburgh largely adheres. (Ex. 3 ¶¶ 11-12 to Def.'s Br. Hickton; Ex. F to Pl.'s Br. Hickton.)

ERAC-Pittsburgh pays an annual management fee to ERAC-Missouri for, among other things, the privilege of using ERAC trademarks and the Enterprise brand name. (Ex. 3 ¶¶ 8, 10 to Def.'s Br. Hickton.) ERAC-Pittsburgh frequently holds itself out to consumers as part of the Enterprise brand. For example, its signs at Pittsburgh-area airports read "Enterprise Rent-A-Car Company" without specifying "Enterprise Rent-A-Car Company of Pittsburgh." (Ex. C at 145 to Pl.'s Br. Hickton.)

Nettles testified at his deposition that branch managers and assistant branch managers at his subsidiary have been classified as exempt from the FLSA overtime provisions ever since he put in place the management structure in 1989, and he based this structure upon his prior experience:

> Q.      Are all of the branch managers at Enterprise Pittsburgh exempt from the overtime requirements of the FLSA and Pennsylvania Wage Law?
>
> A.      They are, yes.
>
> Q.      Same question for assistant branch managers.
>
> A.      Yes.
>
> Q.      In your current position, has that always been the case for both branch managers and the assistant branch managers?
>
> A.      That's the structure I put in place.
>
> Q.      You put in place?

A.     Yes.

Q.     When did you put that structure in place?

A.     When I opened the subsidiary in 1989.

Q.     Who made that – well, you said you decided.  That was your –

A.     That was my structure.  That's what I put in place, yes.

Q.     Did anybody from the parent company have any input into that structure as you put it?

A.     As far as my ultimate decision to go that route, no.

Q.     Did you consult with anybody from the parent company about your choice to make these positions exempt?

A.     No.

Q.     How did you decide to make these positions exempt?

A.     It's more from just my past experience.
        Again, in the Tampa subsidiary I was a daily rental branch manager.  It's a system where salary plus the commission on the profitability of that branch.  And it's a very, very motivating factor. I always felt that, and that's the way that I'm compensated.  Being paid off of what you produce is the ultimate way to go.

(Def.'s App., Ex. 12 at 34-35.)

Nettles testified at his deposition that personnel hiring decisions were his alone, and

defendant parent's office did not have input:

Q.     Did the parent company have any input into their hiring in their current positions?

A.     As far as the decision to hire them?

Q.     Yes.

A.     No.

Q.      Were you the sole person to decide to hire those people?

A.      I made the final decision, yes.

Q.      Was input provided by anybody else?

A.      Input that I might have solicited.

Q.      Who would you solicit that other information from?

A.      I have a rather unique hiring style. Depending on the position, I will get input from other department heads, which those all are. If that person I'm hiring for has overlap or touches those other departments on a regular basis, I make them part of the interview process. I might have, if they came from another subsidiary, would have had conversation with their supervisor at the other subsidiary, seeing what kind of job they were doing there.

Q.      Did you communicate with the parent company for the hiring of any of those individuals?

A.      Only from the standpoint that that would be a significant item that I might, would have included in my end of the month report.

Q.      But are you saying that prior to making the decision to hire these people, are you saying that you did not contact corporate?

A.       I didn't contact corporate specifically on that matter. There is a timing issue, though. If last month's report there was an opening, that might have, that would qualify to me as a significant item, I would mention that in my, let's see, January report. I may not replace the person until February. And then once they're replaced, that would make the report in February as somebody that I selected to take over one of those positions.

Q.      If there is an opening in one of those positions, does the parent company ever make a suggestion on an individual to fill that position?

A. In my case, no.

Q.      And when you say in your case no, do you know whether the parent company would make such a suggestion in other operating subsidiaries?

> A.     I wouldn't know that. But based on having worked in three other subsidiaries, I have never seen it happen. And I have worked for numerous Rick Allen types over my 30 years, and in my tenure, I have never seen that.

(Ex. 6 at 25-27 to Def.'s Br Hickton.)

With respect to whether the best practices guide was mandatory, Nettles stated:

> Q.     Now, you just spoke about proposed edits to this. Who do those edits go to, who are they sent to?
>
> A.     I believe the request for any changes came from Ed Adams.
>
> Q.      From Ed Adams.  And Ed Adams –
>
> A.     He's at the parent.
>
> Q.     At the parent company.
>
> A.     I believe he's in the HR Department.  You also mentioned earlier about the dress codes.
>
> Q.     Right.
>
> A.     And after thinking about that, again, that's not a hard-cut-stone dress code.  For example, we have a Hawaiian operation, and they wear the Aloha shirts, much to the chagrin of most of us on the mainland.  I can remember years ago my counterpart who ran the Cleveland operation used to make fun of me because my, the men at least would wear blue blazers and kaki [sic] slacks and he made all his people wear white shirts and suits all the time, and he took a harder approach to the dress code than what I took. I took a more casual approach to the dress code.

(Id. at 127-28.)

With respect to advertisements, Nettles testified:

> Q.     Does anybody from the parent company need to review the material that's incorporated in the advertising for Enterprise Pittsburgh?
>
> A.     Not review. At one point in time I did my own ads.
> More recently, there is a department in St. Louis that has some creative people that are much smarter and can put together

> ads much better than I can, and I've elected to purchase those ads
> from them.

(Id. at 146.)

Nettles testified that, despite the recommended job descriptions provided by ERAC-Missouri to the operating subsidiaries, "we don't use a job description." (Def.'s reply exhibit, Ex. 26 at 179.)

The sole members of the board of directors of ERAC-Pittsburgh were Nicholson, Snyder, and Taylor. (Ex. 4 ¶ 6 to Def.'s Br. Hickton.) The officers were Allen (vice president), Louis Guido (vice president), Mark Litow ("Litow") (secretary), Nettles (vice president), Nicholson (president), and Snyder (vice president, assistant secretary, and treasurer). (Id.) Taylor, Nicholson, and Snyder are directors and executives of defendant parent; Allen and Litow are executives of defendant parent. (Ex. 1 ¶ 4 to Def.'s Br. Hickton.)

The board of directors of ERAC-Pittsburgh functioned through written consents rather than formal meetings. (Ex. B at 172 to Pl.'s Br. Hickton; see Exs. J, K to Pl.'s Br. Hickton.) One consent was titled "Action by Joint Consent in Lieu of the October 2008 Annual Meeting of Shareholders and Organization Meeting of Board of Directors of Enterprise Rent-A-Car Company of Pittsburgh." (Ex. K to Pl.'s Br. Hickton.) The consents would sometimes involve and apply to a number of subsidiaries. (See, e.g., Ex. J to Pl.'s Br. Hickton.) Over a four-year period, ten unanimous written consents were executed involving only ERAC-Pittsburgh, and two of those related to matters other than the appointment or resignation of officers. (Decl. of Gerald D. Wells, III ¶ 26 to Pl.'s Br. Hickton.) The directors of ERAC-Pittsburgh decided quarterly on the amount of the dividend to be paid to ERAC-Missouri. (Ex. I at 11 to Pl.'s Reply Hickton; Ex. 1 ¶ 10 to Def.'s Br. Hickton.) As an officer of ERAC-Pittsburgh, Snyder, who also was an executive vice president, assistant secretary, and director of ERAC-Missouri, was authorized to

open bank accounts for ERAC-Pittsburgh and transfer funds from ERAC-Pittsburgh's accounts. (Ex. 1 ¶ 4 to Def.'s Br. Hickton; Ex. 4 ¶ 14 to Def.'s Br. Hickton.)

Hickton was formerly an employee of ERAC-Pittsburgh. (Ex. 4 ¶ 10 to Def.'s Br. Hickton.) Hickton signed an acknowledgement that he was employed only by ERAC-Pittsburgh, and not ERAC-Missouri. (See Ex. 15 to Def.'s Br. Hickton.) The acknowledgement stated:

> By signing below, I acknowledge the receipt of the *Enterprise Business Practice Guide, Personnel Policies and Benefits Summary Plan Description* effective January 1, 2006, and acknowledge that I have read and understand the practices, policies, and benefits addressed in this book, including the Acknowledgement section, and agree to its terms and conditions.
>
> . . . .
>
> I additionally acknowledge that unless specifically employed and assigned to the corporate headquarters, I am employed only by the subsidiary or affiliate where hired or assigned and not employed by the corporate parent or any other related or affiliated company.

(Def.'s Br. Hickton, Ex. 15.)

When Hickton was promoted to branch manager for ERAC-Pittsburgh, he traveled to ERAC-Missouri's offices for additional training. (Ex. F ¶ 5 to Pl.'s Reply Hickton.) When interviewing prospective employees, Hickton was directed to ask questions from an approved list supplied by the HR department. (Id. ¶ 33.) Hickton was required to seek the input and authorization of his area manager or group rental manager before formally reprimanding an employee, and after giving a formal reprimand, he was required to contact the human resources department.[13] (Id. ¶¶ 51, 52.) The responsibility for employment decisions was held by the area

---

[13] In his declaration, Hickton does not specify whether the human resources department he refers to is ERAC-Missouri's HR department or ERAC-Pittsburgh's human resource deparment. (See Ex. F ¶ 52 to Pl.'s Reply Hickton.)

manager, loss control manager, or human resources department,[14] and the loss control manager was primarily responsible for termination of employees. (Id. ¶ 54.) Hickton was not empowered to hire or fire employees. (Id.) As an employee, Hickton believed that ERAC-Pittsburgh and ERAC-Missouri were one and the same. (Id. ¶ 4.) All employees referred to ERAC-Missouri and the operating subsidiaries collectively, as "Enterprise." (Id.) ERAC-Pittsburgh sometimes advertised to the public as simply "Enterprise Rent-A-Car Company," without reference to the Pittsburgh region. (See Ex. 6 at 145 to Def.'s Br. Hickton.)

### H. ELC-Chicago

ELC-Chicago is a wholly owned operating subsidiary of ERAC-Missouri. (Ex. D ¶ 4 to Def.'s Br. Averill.) ELC-Chicago is organized and operated in a nearly identical manner to ERAC-Pittsburgh. ELC-Chicago maintains a headquarters in Lombard, Illinois, shares no offices or records with ERAC-Missouri, files its own annual reports, and at the time of the commencement of the action by Averill had its own articles of incorporation and bylaws. (Ex. G ¶¶ 5, 8 to Def.'s Br. Averill.) ELC-Chicago has the authority to make all general business decisions related to operations and financial dealings. (Id. at ¶¶ 9, 12.) ELC-Chicago pays ERAC-Missouri regular corporate dividends. (Id. ¶ 13.)

At the time the complaint was filed by Averill, the sole members of the board of directors of ELC-Chicago were Nicholson, Snyder, and Taylor. (Ex. G ¶ 6 to Def.'s Br. Averill.) The officers were Litow (secretary), Nicholson (president), Snyder (treasurer, vice president, and assistant secretary), Loren Ahlgren (vice president), Michael Cruickshank (regional vice president), David Livon ("Livon") (vice president), James McCarthy (regional vice president), Daniel Milwit (vice president), Steven Nelick (regional vice president), David Pepper (vice

---

[14] See supra note 13.

president), Denis Phelan (regional vice president), Brendon Ross (vice president), James Strack (regional vice president), and Jeffrey Wilder (vice president).  (Id.)  ELC-Chicago paid corporate dividends, authorized by its board of directors, to ERAC-Missouri.  (Ex. D ¶ 9 to Def.'s Br. Averill.)  Taylor, Nicholson, and Snyder served as directors of ERAC-Missouri and ELC-Chicago.  (Ex. D ¶ 3 to Def.'s Br. Averill.)  Taylor, Litow, Nicholson, Snyder, and Livon were executives of defendant parent and ELC-Chicago.  (Id.)

Averill had to submit his employment application via the Enterprise brand's website. (Ex. 13 ¶ 4 to Pl.'s Br. Averill.)   Averill was formerly an employee of ELC-Chicago. (Ex. G ¶ 10 to Def.'s Br. Averill.)  Averill signed an acknowledgement that he was employed only by ELC-Chicago, and not ERAC-Missouri. (See Ex. H to Def.'s Reply Averill.)  The acknowledgement stated:

> By signing below, I acknowledge the receipt of the *Enterprise Business Practice Guide, Personnel Policies and Benefits Summary Plan Description* effective January 1, 2006, and acknowledge that I have read and understand the practices, policies, and benefits addressed in this book, including the Acknowledgement section, and agree to its terms and conditions.
>
> . . . .
>
> I additionally acknowledge that unless specifically employed and assigned to the corporate headquarters, I am employed only by the subsidiary or affiliate where hired or assigned and not employed by the corporate parent or any other related or affiliated company.

(Def.'s Reply Averill, Ex. H.)

Constance Powell ("Powell"), an opt-in plaintiff in the Averill action who worked at locations in Florida for almost three years, alleges she worked for defendant parent.  (Ex. 14 ¶¶ 1-3, 8 to Pl.'s Br. Averill.)  After she was appointed branch manager at a branch in Florida, she attended a seminar with ERAC-Missouri in St. Louis.  She asserted that Taylor was the chairman

of ERAC-Missouri, and he stated that ERAC-Missouri's risk management and compliance department was responsible for Enterprise Rent-A-Car's national policies, procedures, and rules. (Id. ¶ 4.)  Powell stated she toured a "computer mainframe and it housed at least 100 towers," and she alleged that she was told all computer activities were monitored by the mainframe and "everything computer related was handled by St. Louis."  (Id. ¶ 5.)  She stated that "[m]ultiple times a month we would receive emails from [ERAC-Missouri]'s St. Louis office . . . .  These emails usually were directives to increase sales, budget reports, marketing reminders, reminders to review our mission statement, [and] emails requiring participation in the 'get green' program." (Id. ¶ 6.)  She averred:

> At no time during my employment did I believe Enterprise Rent A Car company was not my employer.  I know [ERAC-Missouri] was my employer.  The interaction between my branches and Corporate St. Louis was seamless and continuous.  Everything was monitored by St. Louis.  In fact, my superiors stated even on "call back" notes in the system was had to be careful because if we typed disparaging comments about a [sic] unruly customer St. Louis would call and reprimand the superior.

(Id. ¶ 8.)


*III. Applicable Law*

In the context of multidistrict litigation, when analyzing claims arising under federal law, there is a preference for applying the law of the circuit in which the transferee court is located. See In re Trade Partners, Inc., Investors Litig., Nos. 1:07-CV-738, 1:07-CV-750, 1:07-CV-775, 2008 WL 3979238, at *2 (W.D. Mich. Aug. 22, 2008); see also In re Comp. of Managerial, Prof'l and Technical Employees Antitrust Litig., No. 02-CV-2924, 2006 WL 38937, at *2 (D.N.J. Jan. 5, 2006) ("the transferee court [should] be free to decide a federal claim in the manner it views as correct without deferring to the interpretation of the transferor circuit.").

When analyzing claims under state law, "'the transferee court must apply the state law that would have applied had the cases not been transferred for consolidation.'" In re Genetically Modified Rice Litig., 576 F.Supp.2d 1063, 1077 (E.D. Mo. 2008) (quoting In re Gen. Am. Life Ins. Co. Sales Practices Litig., 391 F.3d 907, 911 (8th Cir. 2004)).

The parties do not dispute that precedential opinions of the Court of Appeals for the Third Circuit are consistent with the law of the transferor forums. The court will follow precedential decisions of the Court of Appeals for the Third Circuit with respect to the federal questions presented. To the extent the parties cited case law of the Court of Appeals of the Seventh Circuit and made arguments based upon that law, there are no apparent outcome-determinative differences between the decisions of the Courts of Appeals for the Third Circuit and the Seventh Circuit.

## IV. *Motion to Dismiss for Lack of Personal Jurisdiction*

### A. Standard of Review for Motion to Dismiss for Lack of Personal Jurisdiction

A motion to dismiss pursuant to Rule 12(b)(2) of The Federal Rules of Civil Procedure challenges the ability of a court to exercise jurisdiction over a party to the dispute. If a jurisdictional defect exists, the court lacks the power to adjudicate effectively the controversy. See Flood v. Braaten, 727 F.2d 303, 306 n.12 (3d Cir. 1984) ("because he lacks 'minimum contacts' with [the forum], the district court cannot assert jurisdiction over his person . . . ."); EUGENE F. SCOLES & PETER HAY, CONFLICT OF LAWS at 263 (2d ed. 1992). "When a defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." Mellon Bank (East) PSFS v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992). "If the court elects not to hold a pre-trial

evidentiary hearing on the issue of personal jurisdiction, the nonmoving party may meet its burden by presenting a *prima facie* case in support of the exercise of personal jurisdiction over the moving party." Joint Stock Soc. v. Heublein, Inc., 936 F. Supp. 177, 192 (D. Del. 1996) (citing Mellon Bank (East), 960 F.2d at 1223).

The parties in this case were afforded jurisdictional discovery and the court must look beyond the allegations in the pleadings in assessing whether plaintiffs presented a prima facie case:

> A Rule 12(b)(2) motion, such as the motion made by the defendants here, is inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies. Once the defense has been raised, then the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence. . . . [A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction.

Time Share Vacation Club v. Atlantic Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984) (citing Int'l Ass'n of Machinists & Aerospace Workers v. Northwest Airlines, Inc., 673 F.2d 700 (3d Cir. 1982)). "In other words, the nonmoving party must base its *prima facie* showing of personal jurisdiction over the moving party on evidence of specific facts set out in the record." Joint Stock Soc., 936 F. Supp. at 192 (citing Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)). Any conflicts between the evidence submitted by the plaintiff and the defendant must be construed in the plaintiff's favor. Barrett v. Catacombs Press, 44 F. Supp. 2d 717, 722 (E.D. Pa. 1999). Eventually, the plaintiff must establish in personam jurisdiction by a preponderance of the evidence:

> If the nonmoving party succeeds in presenting a *prima facie* case based on its proffered evidence, the court may order an evidentiary hearing or deny the motion to dismiss. If the court denies the motion to dismiss based on the *prima facie* standard, the moving

> party later may raise again the issue of the exercise of personal
> jurisdiction over it. Eventually, the nonmoving party must establish
> by a preponderance of the evidence, either at a pre-trial hearing or
> at trial, that the exercise of personal jurisdiction over the moving
> party is proper.

Joint Stock Soc., 936 F. Supp. at 193 (internal citations omitted).


**B. Discussion**

In cases where subject-matter jurisdiction is based upon a federal question arising under a

statute and that statute is silent regarding service of process, Rule 4(e) of the Federal Rules of

Civil Procedure provides that a federal district court may exercise personal jurisdiction over a

nonresident defendant to the extent authorized by the law of the forum state in which it sits.

Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 436 (3d Cir. 1987); Eason

v. Linden Avionics, Inc., 706 F. Supp. 311, 327 (D.N.J. 1989).  The FLSA is silent regarding

service of process, and the court must look to state law in this situation.  See Aviles v. Kunkle,

978 F.2d 201, 204 (5th Cir. 1992).

Pennsylvania's long-arm statute allows a court to exercise personal jurisdiction over a

person "to the fullest extent allowed under the Constitution of the United States and may be

based on the most minimum contact with this Commonwealth allowed under the Constitution of

the United States."  42 PA. CONS. STAT. § 5322(b).  The statute is coextensive with the due

process clause of the Fourteenth Amendment to the United States Constitution.  Dollar Sav.

Bank v. First Sec. Bank of Utah, 746 F.2d 208, 211 (3d Cir. 1984).

Illinois' long-arm statute grants a court personal jurisdiction over a person "on any other

basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United

States."  735 ILL. COMP. STAT. 5/2-209(c).  Like the Pennsylvania long-arm statute, the Illinois

long-arm statute is coextensive with the due process clause of the Fourteenth Amendment to the United States Constitution.  See Hyatt Int'l Corp. v. Coco, 302 F.3d 707, 714-16 (7th Cir. 2002).

The due process clause of the Fourteenth Amendment prohibits the exercise of personal jurisdiction over a nonresident defendant unless that defendant has "minimum contacts" with the forum state in order that "the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  Due process "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-72 (1985) (quoting Int'l Shoe Co., 326 U.S. at 319).  There are two situations in which personal jurisdiction may be exercised over a nonresident defendant.  The first, general jurisdiction, arises out of "continuous and substantial forum affiliations," and it may be exercised when the claims do not arise out of the defendant's activities within the forum state.  Dollar Sav. Bank, 746 F.2d at 212.  In contrast, specific jurisdiction "is invoked when the cause of action arises from the defendant's forum related activities," and, in such a case, the focus is on the minimum contacts between the nonresident defendant and the forum.  Id. at 211-12.  Specific jurisdiction requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  Hanson v. Denckla, 357 U.S. 235, 255 (1958).

Hickton and Averill advance three theories in support of the court's exercise of personal jurisdiction over defendant parent: (A) the court has general jurisdiction, (B) the operating subsidiaries are the alter egos of ERAC-Missouri, and (C) the court has specific jurisdiction. The arguments of Hickton and Averill will be separately considered.

**C. Motion to Dismiss With Respect to Hickton's Complaint**

**1. General Jurisdiction**

General jurisdiction exists when the defendant has continuous and systematic contacts with the forum state. Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414-15 (1984); see Feldman v. Bally's Park Place, Inc., No. 05-5345, 2006 WL 1582331, at *2 (E.D. Pa. June 5, 2006) ("Federal courts sitting in Pennsylvania consider the following objective criteria in ascertaining the existence of general jurisdiction: (1) whether defendant is incorporated or licensed to do business in Pennsylvania; (2) whether the defendant has ever filed any tax returns with the Commonwealth of Pennsylvania; (3) whether the defendant files administrative reports with any agency or department of the Commonwealth . . . ."). To determine whether a defendant conducted a continuous and systematic part of its business in the forum state, it is necessary to look at the defendant's activities within the state over a period of time. Modern Mailers, Inc. v. Johnson & Quin, Inc., 844 F. Supp. 1048, 1052 (E.D. Pa. 1994). The evidence required to establish general jurisdiction must be considerable. See Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3rd Cir. 1982) "[T]his is a much higher threshold to meet for the facts required to assert this 'general' jurisdiction must be 'extensive and persuasive.'" Id. (quoting Compagnie des Bauxites de Guinea v. Ins. Co. of N. Am., 651 F.2d 877, 890 (3d Cir. 1981) (Gibbons, J., dissenting)).

**a. Filing of Certificate of Authority**

Hickton explained in a footnote in his reply memorandum of law that on July 30, 2008, ERAC-Missouri filed a certificate of authority with the Secretary of State of Pennsylvania. At oral argument, the issue arose whether the filing of the certificate conferred personal jurisdiction

over defendant parent.  The Court of Appeals for the Third Circuit has held that a Pennsylvania court can exercise personal jurisdiction over a corporation that filed for and received authorization to engage in business in Pennsylvania.  Bane v. Netlink, Inc., 925 F.2d 637, 640 (3d Cir. 1991).  The court of appeals specifically based its holding upon a section of Pennsylvania's long-arm statute that is distinct from the section that is coextensive with the due process clause of the Fourteenth Amendment.  The section relied upon in Bane was 42 PA. CONS. STAT. § 5301, which provides:

> (a)  General Rule.--The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth *to exercise general personal jurisdiction* over such person, or his personal representative in the case of an individual, and to enable such tribunals to render personal orders against such person or representative:
>
> > (2) Corporations.--
> >
> > > (i) Incorporation under or *qualification as a foreign corporation under the laws of this Commonwealth*.
> > >
> > > (ii) *Consent*, to the extent authorized by the consent.
> > >
> > > . . . .
>
> (b) Scope of jurisdiction.--When jurisdiction over a person is based upon this section any cause of action may be asserted against him, whether or not arising from acts enumerated in this section. Discontinuance of the acts enumerated in subsection (a)(2)(i) and (iii) and (3)(i) and (iii) shall not affect jurisdiction with respect to any act, transaction or omission *occurring during the period such status existed*.

42 PA. CONS. STAT. § 5301 (emphasis added).  The court of appeals held that general jurisdiction existed over the corporate defendant in Bane either under subsection (a)(2)(i), since it was a qualified foreign corporation by reason of its authorization to conduct business in Pennsylvania, or under subsection (a)(2)(ii), since the certificate of authority can be viewed as consent to be

sued in Pennsylvania.  Bane, 925 F.2d at 640-41.  Authorization to do business in Pennsylvania, even if the only contact with the state, is sufficient for a Pennsylvania court to exercise jurisdiction.  Eagle Traffic Control, Inc. v. James Julian, Inc., 933 F. Supp. 1251, 1256 (E.D. Pa. 1996).

ERAC-Missouri's authorization pursuant to the certificate of authority would serve as a ground upon which this court could exercise in personam jurisdiction over ERAC-Missouri; provided, that the certificate of authority is a relevant contact that can be considered by the court in this situation.  Defendant argues that the filing of the certificate of authority is not a relevant contact, because contacts between the party and the forum after the complaint was filed are beyond the temporal scope of the personal jurisdictional analysis.

Under the traditional consent theory of jurisdiction, there is no specific time period in which consent or waiver must occur:

> a party's consent to a court's jurisdiction may take place prior to the suit's institution . . . , or at the time suit is brought . . . , or after suit has started.  And having objected to the absence of in personam jurisdiction, a defendant may rescind the objection, i.e., consent to the forum court's jurisdiction, at any stage of the proceedings.

Gen. Contracting & Trading Co. v. Interpole, Inc., 940 F.2d 20, 22 (1st Cir. 1991) (internal citations omitted).  Jurisdiction based upon a certificate of authority in Pennsylvania, however, is limited by the section of Pennsylvania's long-arm statute that is at issue here.  See Bane, 925 F.2d at 641.  That section provides that jurisdiction is only "to the extent authorized by the consent."  42 PA. CONS. STAT. § 5301(b)(ii).  When consent-based jurisdiction is grounded upon a certificate of authority, there is an apparent temporal limit.  The statute provides that if the certificate of authority is withdrawn, general jurisdiction only exists over acts or transactions occurring during the period of authorization.  See 42 PA. CONS. STAT. § 5301(b)(i).  In this case,

defendant parent represented that on July 30, 2008 it inadvertently registered with the Pennsylvania Department of State, and, after becoming aware of the mistake on June 1, 2009, it withdrew the registration. The complaint was filed by Hickton on December 11, 2007. The commencement of the action predates the time period in which defendant parent was registered in Pennsylvania. The actions that underlie this lawsuit, therefore, occurred outside of the time period in which defendant parent was authorized to do business, and 42 PA. CONS. STAT. § 5301 does not provide a basis for personal jurisdiction.

### b. Other Contacts

### i. Time Period in Which Relevant Contacts Are Assessed

The question remains whether contacts after the filing of the complaint are to be considered in determining whether general jurisdiction exists under Pennsylvania's general long-arm statute. Pennsylvania courts may exercise jurisdiction over any party "not within the scope of section 5301 . . . to the fullest extent allowed under the Constitution of the United States." 42 PA. CONS. STAT. § 5322(b). Hickton points to contacts with Pennsylvania occurring after the filing of his lawsuit that he argues are relevant in assessing whether defendant parent has continuous and systematic contacts for purposes of general jurisdiction under § 5322. Besides the business certificate, Hickton points to defendant parent hosting the Enterprise Rent-A-Car website after the lawsuit was initiated.

Hickton cites two decisions in support of consideration of contacts after the filing of the complaint: Educational Testing Service v. Katzman, 631 F. Supp. 550, 556 (D.N.J. 1986), and McMullen v. European Adoption Consultants, Inc., 109 F. Supp. 2d 417, 420 (W.D. Pa. 2000). In Katzman, the district court observed:

> The due process limitations on a court's personal jurisdiction over non-resident defendants is meant to ensure that

individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign [thus giving] a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit [citations omitted]." [Burger King Corp., 471 U.S. at 472]. Once a defendant has been served with a complaint, he is on notice that he may be subject to jurisdiction in that forum. At that time, perhaps more than at any other, the defendant who wishes to contest jurisdiction, frequently on the advice of lawyers, begins ordering his affairs to show that he has no contacts with the forum state.

To use the date of the filing of a complaint in most cases seems appropriate so that a defendant may not avoid liability by removing himself from the jurisdiction. However, that moment in time should not be graven in stone particularly where, as here, the defendant has subsequent to the filing of a complaint established a continuous and systematic presence in the forum state. To permit the filing of a complaint to limit jurisdiction by immunizing a defendant's future actions in the forum state when those actions are a mere continuation of those underlying the complaint would make no sense. Moreover, I fail to see any due process interest which would be served by such immunity.

Katzman, 631 F. Supp. at 556. Although the court used language supporting the exercise of

general jurisdiction (e.g. "continuous and systematic presence in the forum state"), the court in

Katzman specifically addressed the concepts of "relating to" or "arising out of" which relate to

specific jurisdiction. Id. at 554-55, 560.

Hickton also cites McMullen. In that case, the parents of an adopted child sued the

adoption agency for breach of contract and related tort claims, due to the child's medical

condition. McMullen, 109 F. Supp. 2d at 418. The court held the parents would be entitled to

jurisdictional discovery of contacts during the time period after the 1992 adoption, stating that

the "absence of a bright-line rule establishing a temporal framework for the minimum contacts

analysis strongly reinforces the fact-specific, case-by-case nature of all jurisdictional analysis.

We are persuaded that a broader timeframe, encompassing the time the complaint was filed, is

appropriate here." <u>Id.</u> at 420.

Defendant parent cites a number of decisions which support its position that post-

complaint contacts are irrelevant to the analysis. <u>See, e.g.</u>, <u>Harlow v. Children's Hosp.</u>, 432 F.3d

50, 65 (1st Cir. 2005); <u>Noonan v. Winston Co.</u>, 135 F.3d 85, 95 (1st Cir. 1998); <u>Metro. Life Ins.</u>

<u>Co. v. Robertson-Ceco Corp.</u>, 84 F.3d 560, 569-70 (2d Cir. 1996); <u>Feldman</u>, 2006 WL 1582331,

at *2 n.3; <u>Fiacco v. Sigma Alpha Epsilon Fraternity</u>, No. Civ. 1:05-145-GZS, 2006 WL 890686,

at *5 n.6 (D. Me. Mar. 31, 2006); <u>United Phosphorous, Ltd. v. Angus Chem. Co.</u>, 43 F. Supp. 2d

904, 910 (N.D. Ill. 1999); <u>CIVIX-DDI LLC v. Microsoft Corp.</u>, No. 99-B-172, 1999 WL

1020248, at *1508 (D. Colo. Oct. 1, 1999).

In <u>United Phosphorous</u>, the plaintiffs brought an antitrust action claiming that the

defendants conspired to prevent the plaintiffs from entering the market for production of

chemicals used in a certain prescription drug. Defendant Lupin Laboratories moved to dismiss

for lack of personal jurisdiction. The complaint was filed in the Northern District of Illinois on

April 4, 1994, and the district court refused to consider contacts with Illinois after that date. The

court noted that the case involved *specific* jurisdiction because Lupin Laboratories' contacts with

Illinois arose from the alleged involvement in a conspiracy with the other defendants, and in the

context of specific jurisdiction:

> The focus on whether a defendant has purposefully availed itself of
> the privilege of conducting activities in the forum state necessarily
> implies that only conduct prior to the accrual of the cause of action
> or, at the very latest, the filing of the lawsuit is relevant. In other
> words, "purposeful availment" implies that the defendant, as
> shown by its activities, intended to be amenable to suit in the
> forum state. Conduct post-dating the filing of a complaint by
> definition cannot show that, when the defendant engaged in the
> post-complaint acts purportedly supporting jurisdiction, it

> intentionally exposed itself to the possibility of an event which had already occurred (the filing of a complaint in the forum state).

United Phosphorous, 43 F. Supp. 2d at 908.

The court rejected the plaintiffs' request to consider post-complaint contacts for three reasons. First, the plaintiffs failed to cite any case law that supported the theory that all contacts, regardless whether they are pre- or post-suit, are jurisdictionally relevant. Id. at 910. Second, the plaintiffs failed to cite any case law that supported the court's ability to exercise jurisdiction (either general or specific) over a defendant where the events supporting jurisdiction occurred after the filing of the complaint. Id. Third,

> the rules regarding personal jurisdiction are founded on the Due Process Clause, which requires that an individual have "fair warning" that a particular activity may subject it to the jurisdiction of the forum state. See, e.g., [Burger King Corp., 471 U.S. at 472]. While pre-suit activities may rise to the level of a "fair warning" that a defendant may be haled into a court in the forum state, post-suit activities cannot serve to warn the defendant of an event that has already occurred. The fact that the complaint alleges that the conspiracy continues to this day, therefore, is not jurisdictionally significant.

Id.

The only decision cited by either party that examines in detail the relevant legal concepts with respect to *general* jurisdiction is Metropolitan Life. In that decision, the court considered the defendant's argument that the evaluation of continuous and systematic contacts should only focus upon those contacts with the forum during the year in which the complaint was filed. The plaintiff argued for a broader time period, going back six years from the date of the filing of the complaint. The court noted that the Supreme Court considered contacts with the forum state over a seven-year period in Helicopteros, and recognized that the "phrase 'continuous and systematic' necessarily requires that courts evaluate the defendant's contact with the forum state

over time." <u>Metro. Life Ins. Co.</u>, 84 F.3d at 569. The court concluded "[i]n general jurisdiction cases, district courts should examine a defendant's contacts with the forum state over a period that is reasonable under the circumstances–*up to and including the date the suit was filed*–to assess whether they satisfy the 'continuous and systematic' standard." <u>Id.</u> at 569-70 (emphasis added).

In <u>CIVIX-DDI</u>, the underlying contact asserted to support personal jurisdiction was the defendant's acquisition on May 27, 1999 of a ten percent equity stake in a corporation based in Colorado, the forum state. The lawsuit was filed on January 26, 1999. The court refused to consider the acquisition for purposes of general jurisdiction, because this contact post-dated the initiation of the lawsuit. The court did not analyze the issue, but quoted several decisions including <u>Metropolitan Life</u>. <u>CIVIX-DDI LLC</u>, 1999 WL 1020248, at *1508.

Although the court in <u>Metropolitan Life</u> stated that the temporal scope of general jurisdiction ends at the time of the complaint, there was no issue in that case with respect to whether contacts *after* the complaint should be considered. The Court of Appeals for the Second Circuit in <u>Metropolitan Life</u> commented that the court is bestowed with significant flexibility: "[t]he minimum contacts inquiry is fact-intensive, and the appropriate period for evaluating a defendant's contacts will vary in individual cases. . . . The determination of what period is reasonable in the context of each case should be left to the court's discretion." <u>Metro. Life Ins. Co.</u>, 84 F.3d at 569.

Both <u>Katzman</u> and <u>United Phosphorous</u> involved the same issue – whether a court can consider post-complaint contacts in analyzing specific jurisdiction. The courts in the two decisions, relying upon the same language in <u>Burger King</u>, reached opposite conclusions. In <u>Katzman</u>, the court considered post-complaint conduct, stating that once a defendant corporation

is served with a complaint, it has fair notice that it may be subject to jurisdiction in the forum, and should accordingly structure its behavior.  <u>Katzman</u>, 631 F. Supp. at 556.  In <u>United Phosphorus</u>, the court did not consider post-complaint conduct, stating that such activities cannot provide "fair warning."  <u>United Phosphorus</u>, 43 F. Supp. 2d at 910.  This court need not resolve the conflict because, even taking into consideration defendant parent's post-lawsuit contacts, Hickton did not adduce evidence of sufficient contacts with Pennsylvania to establish general personal jurisdiction.

### ii. Analysis of the Contacts

Hickton argues ERAC-Missouri has continuous and systematic contacts with Pennsylvania through its (a) contact centers, (b) business conducted in the state, (c) interactive website, and (d) advertisements.

Until January 2008, ERAC-Missouri operated a contact center.  It reached out to prospective customers on a nationwide basis with a toll-free telephone number, and all calls to this number were dealt with by the contact center.  Customers were assisted by representatives at the contact center, and, if further assistance was necessary, the calls could be directed to an individual branch location, including those branch locations operated by ERAC-Pittsburgh.

Hickton argues that ERAC-Missouri conducted business in Pennsylvania.  ERAC-Missouri solicited business from Pennsylvania residents and businesses, using its national marketing department.  ERAC-Missouri also operated various "booking channels" to facilitate automobile rentals.  One such booking channel is the enterprise.com website that individuals can use to reserve vehicle rentals.  Another booking channel is ARMS, used by insurance companies to reserve vehicle rentals.  Defendant parent also uses third-party booking channels that enable customers to reserve rental vehicles via travel websites such Travelocity.com and Orbitz.com.  In

addition, ERAC-Missouri was authorized to do business in Pennsylvania for a limited period of time after the complaint was filed in this case.[15]

The Enterprise brand's website, enterprise.com, is highly interactive and commercial in nature. Pennsylvania residents can create reservations at branch locations in Pennsylvania. ERAC-Missouri's e-commerce team is responsible for the content of the website; ERAC-

---

[15] With respect to the business allegedly conducted by ERAC-Missouri in the state of Pennsylvania, Hickton makes no general jurisdiction argument regarding the administrative services ERAC-Missouri provided to subsidiaries within the forum, other than advertising and the booking channels that aid the reservation of vehicles. Averill relies upon the benefits provided by ERAC-Missouri. Hickton and Averill focus upon the services in greater depth in arguing that personal jurisdiction can be based upon an alter-ego theory. ERAC-Missouri is not a pure holding company, because it is a provider of a variety of administrative services to the operating subsidiaries and entered into national car rental contracts. Business connections to the forum can, in certain circumstances, be sufficient to confer in personam jurisdiction, and in this situation the subsidiaries are in essence customers for ERAC-Missouri's administrative services. A number of factors are relevant in evaluating whether business ties to a forum are sufficient for general jurisdiction purposes:

> A myriad of factors have been taken into account by the federal courts in making a determination on the critical question of what constitutes doing business in the forum state for purposes of [general] in personam jurisdiction. For example, when a corporation solicits business in the forum state through a local office such as an airline or railroad ticket office, or through the constant efforts of locally based agents, or maintains a distributor in the forum state, it usually is held to be doing business in the state for purposes of empowering courts in that state to assert jurisdiction. Similarly, the sending of various types of agents, or district managers or service representatives, into the forum state on a regular basis to solicit business for the defendant also constitutes doing business (thereby casting doubt on the old rule that mere solicitation was not enough to establish personal jurisdiction). However, if the nonresident corporation's business in the state is conducted by independent contractors with only limited power to act on behalf of the corporation, then the corporation probably will not be held to be doing business in the state and therefore will not be amenable to service of process.

4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1069.2 at 136-41 (3d ed. 2002). Similar factors consider the "existence of an office in the state; the solicitation of business in the state; the presence of bank accounts and property in the state; the authority to do business in [the forum] as a foreign corporation; and the relative percentage of business done in [the forum] by the defendant." William Sys., Ltd. v. Total Freight Sys., Inc., 27 F. Supp. 2d 386, 387 (E.D.N.Y. 1998) (applying New York law). The conferral of general jurisdiction based upon business ties might not be appropriate in the parent-subsidiary context, given the unique relationship between the parties. See In re Chocolate Confectionary Anti-Trust Litigation, 641 F. Supp. 2d 367, 389-90, 396-99 (M.D. Pa. 2009) (analyzing general jurisdiction in the context of parent corporations, and not giving special consideration to administrative services as business ties). No decision was located which found general jurisdiction existed due to administrative services being furnished by an out-of-forum parent entity to its subsidiaries that operated in the forum. Even if general jurisdiction could be based upon the business relationships between ERAC-Missouri and its operating subsidiaries, Hickton and Averill did not make any arguments or direct the court to evidence relating to the pertinent factors – in particular, the percentage of ERAC-Missouri's service-related business conducted with the relevant operating subsidiaries in this action.

Pittsburgh does not maintain any hyperlinked websites or webpages. Hickton alleges that Pennsylvania residents are specifically targeted by the website, because, by providing the ability to reserve automobiles at Pennsylvania branch locations, the site is specifically tailored to the needs of Pennsylvania residents.

ERAC-Missouri's marketing and communications division provides subsidiaries with a variety of marketing materials, including advertisements and promotional materials. Hickton notes that the advertisements provided to subsidiaries portray Enterprise Rent-A-Car as a unified company. In order for a subsidiary to refrain from participating in a promotional campaign, the subsidiary must advise the contact centers of its intention to do so. Mar Com also creates the advertisements displayed on the enterprise.com website.

Defendant parent argues that Hickton failed to meet the substantial burden of establishing general jurisdiction. The continuous and systematic contacts necessary to establish general jurisdiction must be a central part of the defendant's business. Provident Nat'l Bank, 819 F.2d at 437-38; see Fisher v. Teva PFC SRL, 212 F. App'x 72, 75 (3d Cir. 2006) ("The contacts must also be a central part of the defendant's business."). Defendant parent notes that the Court of Appeals for the Third Circuit has on multiple occasions rejected the contention that general jurisdiction arises from a website. See, e.g., Kehm Oil Co. v. Texaco, Inc., 537 F.3d 290, 300 (3d Cir. 2008). Defendant parent argues that the subsidiaries set rules and rates for vehicle rentals and communicate those rules and rates to ERAC-Missouri's IT specialists who maintain the website. Defendant parent asserts the contact center's primary purpose is to accept phone calls and to place reservations on behalf of the operating subsidiaries. The operating subsidiaries are not required to use the services of the contact center, and must pay a fee for its use. Defendant parent contends that the booking channels merely direct potential customers to the

operating subsidiaries, and the business transactions are between the customers and subsidiaries. With respect to the advertisements, defendant parent argues that advertisements in broadly-circulated publications do not establish continuous and systematic contacts with a specific forum.

The court must collectively look at all defendant parent's contacts. Often the evidence offered by a plaintiff when viewed in isolation is not sufficient to confer general jurisdiction over a corporation, but if viewed in conjunction with all the evidence presented it may be sufficient. See Forest Labs. Inc. v. Cobalt Labs. Inc., No. 08-21-GMS-LPS, 2009 WL 605745, at *8 (D. Del. Mar. 9, 2009) (considering the proffered contacts collectively). Even viewing all evidence collectively, however, the court does not find that defendant parent's contacts are sufficiently substantial and continual to render the exercise of personal jurisdiction reasonable in this situation. The burden of establishing general jurisdiction is "rigorous." Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc., 269 F. Supp. 2d 547, 553 (D.N.J. 2003); see Saudi v. Acomarit Maritimes Services, S.A., 114 F. App'x 449, 453 (3d Cir. 2004) ("The standard for evaluating whether minimum contacts satisfy the test for general jurisdiction is more stringent than the test applied to questions of specific jurisdiction.").

With respect to defendant parent's website, the court notes that the website is for the Enterprise brand. The website is not specific to either ERAC-Missouri or the operating subsidiaries, but instead portrays Enterprise Rent-A-Car as a single company. The significance in this portrayal is minimal, because, in the context of general jurisdiction, the issue is whether the website targets Pennsylvania or is related to defendant parent's business activities in Pennsylvania.[16] "Where a website is interactive and general jurisdiction is at issue, the court

---

[16] For the same reason, there is little significance attached to defendant hosting the website. If the act of hosting a website was sufficient to confer general jurisdiction upon a defendant, then Pennsylvania would be vested with jurisdiction over every host of a website on the seemingly infinite world-wide web. That result would render due process superficial.

must analyze whether the website is targeted specifically to Pennsylvanians and whether the website is central to the defendant's business in Pennsylvania." Mueller v. Sunshine Rest. Merger Sub LLC, No. 1:09-CV-0443, 2009 WL 1107263, at *3 (M.D. Pa. Apr. 23, 2009) (citing Haas v. Four Seasons Campground, Inc., 952 A.2d 688, 695 (Pa. Super. Ct. 2008)); see O'Connor v. Sandy Lane Hotel Co., No. Civ.A. 04-2436, 2005 WL 994617, at *3 (E.D. Pa. Apr. 28, 2006) ("O'Connor I"), rev'd with respect to specific jurisdiction, 496 F.3d 312, 317 (3d Cir. 2007) ("O'Connor II"); see also 16 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 208.44[3] at 108-90 to 108-90.1 (3d ed. 2009) ("When an internet website is coupled with substantial business activity in the forum state, general jurisdiction may be found to exist.").

There is no evidence of record that the website specifically targets Pennsylvania residents. Instead, the website is akin to an advertisement in an international publication. The website is central to ERAC-Pittsburgh's business in Pennsylvania, since customers can reserve automobiles for rent via the website. The website is not central, however, to ERAC-Missouri's business, since ERAC-Missouri is a holding company that provides administrative services to its operating subsidiaries, but does not rent automobiles. For similar reasons, the significant interactive features of the website foster interactivity between Pennsylvania residents and the operating subsidiaries, and not between Pennsylvania residents and defendant parent. See In re Nazi Era Cases Against German Defs. Litig., 320 F. Supp. 2d 204, 220 (D.N.J. 2004) (holding that the parent's website, "which serves as a shopping 'portal' that allows customers to transact business with and purchase goods from [the parent]'s subsidiaries," did not establish personal jurisdiction); Carpenter v. Exelon Corp., No. 14-07-00149-CV, 2007 WL 3071998, at *3 n.11 (Tex. App. Oct. 23, 2007) (although customers could engage in online transactions with subsidiaries through a website owned and operated by the parent, "the use of the website by [the

parent]'s subsidiaries generally cannot be imputed to [the parent] to establish personal jurisdiction over [the parent]" since separate corporations are presumed to be distinct entities). The court concludes that the jurisdictional significance of the website is limited.

With respect to the contact centers, "there can be no dispute that the maintenance of a toll-free number is not a forum contact significant or continuous enough to ground general jurisdiction." O'Connor I, 2005 WL 994617, at *4. The contact centers serve a function almost identical to the website, because those centers direct customers to operating subsidiaries with whom the customers can reserve rental vehicles.

The court concludes that the booking channels are subject to an analysis comparable to that applied to the website. Even though the booking channels are maintained by defendant parent, the channels are used to arrange rental reservations. The arranged-for transaction takes place between the customer and subsidiary – not between the customer and defendant parent. Defendant parent's maintenance of the booking channels might be a contact with Pennsylvania, but the significance of the contact is limited, since the major business activity of the booking channels is between Pennsylvania residents and the operating subsidiaries.

With respect to the advertisements created by defendant parent's Mar Com division, there is no evidence of record that the content of the advertisements directly targeted Pennsylvania residents. General advertising in a medium that reaches a widespread audience does not constitute continuous and systematic contact with Pennsylvania. Gehling v. St. George's Sch. of Med., Ltd., 773 F.2d 539, 542 (3d Cir. 1985) (refusing to exercise general jurisdiction over a medical school that sent representatives on a media tour to appear on Pennsylvania radio and television shows in order to gain exposure, and also holding "[t]he New York Times and Wall Street Journal are non-Pennsylvania newspapers with international circulations, and advertising

in them does not constitute 'continuous and substantial' contacts with the forum state").  The

advertisements were used to promote the automobile rental business, which is the business in

which the operating subsidiaries engage, not defendant parent.

Viewing all the evidence as a whole, the court finds that defendant parent's contacts with

Pennsylvania are not sufficiently substantial and continuous to permit the exercise of personal

jurisdiction over defendant parent in Pennsylvania.

**2. Alter-Ego Theory**

There is no dispute that this court may exercise both specific and general personal

jurisdiction over ERAC-Pittsburgh.  This court would have jurisdiction over ERAC-Missouri, if

ERAC-Pittsburgh's actions are attributable to ERAC-Missouri.

> When a subsidiary of a foreign corporation is carrying on business
> in a particular jurisdiction, the parent company is not automatically
> subject to jurisdiction in that state because of the presumption of
> corporate separateness.  Thus, if the subsidiary's presence in the
> state is primarily for the purpose of carrying on its own business
> and the subsidiary has preserved some semblance of independence
> from the parent and is not acting as merely one of its departments,
> personal jurisdiction over the parent corporation may not be
> acquired simply on the basis of the local activities of the subsidiary
> company.  The very nature of these often very difficult issues
> makes their resolution extremely fact dependent.
>
> . . . .
>
> [I]f the subsidiary['s] . . . separate corporate status is formal only
> and without any semblance of individual identity, then the
> subsidiary's business will be viewed as that of the parent and the
> latter will be said to be doing business in the jurisdiction through
> the subsidiary for purposes of asserting personal jurisdiction.

4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE §

1069.4 at 163-64, 74 (3d ed. 2002).  This concept is known as the alter-ego theory, and has been

utilized by courts in this jurisdiction to determine whether a court may exercise personal

jurisdiction over a foreign parent corporation. See, e.g., Square D Co. v. Scott Elec. Co., No. 06-00459, 2008 WL 2704583, at *2 (W.D. Pa. July 7, 2008).

Whether the exercise of jurisdiction over a parent corporation is proper under the alter-ego theory depends upon the details of the unique relationship between the parent corporation and its subsidiary. See Bulova Watch Co. v. K. Hattori & Co., 508 F. Supp. 1332, 1334 (E.D.N.Y. 1981). The parent-subsidiary relationship itself is not sufficient to establish in personam jurisdiction over the parent entity. In Botwinick v. Credit Exchange, Inc., 213 A.2d 349, 353 (Pa. 1965), the Pennsylvania Supreme Court relied on Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333 (1925), in determining whether personal jurisdiction existed. The Pennsylvania Supreme Court discussed the background of Cannon Manufacturing:

> Cannon sued Cudahy Packing Company, a Maine corporation, in North Carolina. Service of process was made in North Carolina upon Cudahy Packing Company of Alabama, a subsidiary of the Maine corporation. To show the Maine corporation was doing business in North Carolina, Cannon sought to show the identity pro hac vice between the Maine and Alabama corporations. The Maine corporation owned all the capital stock of the Alabama corporation and 'the [Maine corporation] dominate[d] the [Alabama corporation], immediately and completely'; the Alabama corporation marketed the products of the Maine corporation not as agent but as a subsidiary and bought such products from the Maine corporation and sold such products to dealers. Each corporation maintained its corporate identity separately and distinctly. The United States Supreme Court, speaking through the late Mr. Justice Brandeis, refused to ignore the corporate existence, carefully maintained, in determining the existence of jurisdiction and set aside the service made on the subsidiary corporation, stating, inter alia: '[S]uch use of a subsidiary does not necessarily subject the parent corporation to the jurisdiction' of North Carolina and 'The corporate separation, though perhaps merely formal, was real. It was not pure fiction[.]'

Botwinick, 213 A.2d at 353 (internal citations omitted).

Courts which apply the rationale of <u>Cannon</u> require the demonstration of a relationship beyond the mere parent-subsidiary association in order for the exercise of jurisdiction over the parent to be constitutionally permissible.  To prevail under the alter-ego theory, a plaintiff must demonstrate that "[t]he degree of control exercised by the parent [is] greater than normally associated with common ownership and directorship."  <u>In re Latex Gloves Prods. Liab. Litig.</u>, No. MDL 1148, 2001 WL 964105, at *3 (E.D. Pa. Aug. 22, 2001).  "Plaintiffs must prove that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent."  <u>Id.</u>

Courts have applied a variety of tests in evaluating the control of the parent over the subsidiary, demonstrating that "the issue may best be dealt with using a flexible, case-by-case standpoint."  <u>Id.</u>  A ten-factor test offers a "discretely individuated and functional framework for this analysis."  <u>Id.</u>  The ten factors include whether:

> (1) the parent owns all or a significant majority of the subsidiary's stock,
>
> (2) commonality of officers or directors exists between the two corporations,
>
> (3) the corporate family possesses a unified marketing image, including common branding of products,
>
> (4) corporate insignias, trademarks, and logos are uniform across corporate boundaries,
>
> (5) corporate family members share employees,
>
> (6) the parent has integrated its sales and distribution systems with those of its subsidiaries,
>
> (7) the corporations exchange or share managerial or supervisory personnel,
>
> (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation,

> (9) the parent uses the subsidiary as a marketing division or as an exclusive distributor, and
>
> (10) the parent exercises control or provides instruction to the subsidiary's officers and directors.

In re Chocolate Confectionary Antitrust Litig., 602 F. Supp. 2d 538, 569-70 (M.D. Pa. 2009) ("Chocolate Confectionary I") (citing Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH, 360 F. Supp. 2d 665, 675 (E.D. Pa. 2005); Directory Dividends, Inc. v. SBC Commc'ns, Inc., No. 01-CV-1974, 2003 WL 21961448, at *3 (E.D. Pa. July 2, 2003)).

"Whether or not the court would pierce the corporate veil and impose liability on the parent for activities of the subsidiary is not the issue here." Bulova Watch Co., 508 F. Supp. at 1342. "[T]he alter-ego test for attribution of contacts, i.e. personal jurisdiction, is less stringent than that for liability." Stuart v. Spademan, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985) (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981)).

Hickton analyzes each of the ten factors. He argues that ERAC-Missouri owned one-hundred percent of the stock of all operating subsidiaries, including ERAC-Pittsburgh. The three-member boards of directors of the operating subsidiaries were comprised of three board members of ERAC-Missouri. Hickton asserts that ERAC-Pittsburgh's board did not act as an independent board, but rather acted via written consents. Enterprise Rent-A-Car markets and promotes itself as a single, homogeneous brand, in which the operating subsidiaries are indistinguishable from the parent. The general Enterprise brand logo is used by ERAC-Pittsburgh, and ERAC-Pittsburgh often holds itself out to consumers as "Enterprise Rent-A-Car Company," without identifying a region. ERAC-Pittsburgh utilizes the services of employees of ERAC-Missouri's IT and HR departments. Other departments of ERAC-Missouri also provide services to subsidiaries. ERAC-Missouri offers a 401(k) plan, profit sharing plan, and

prescription drug plan to all employees. Enterprise uses a uniform, highly-integrated system for renting vehicles. Management and supervisory personnel move from parent to subsidiary and vice versa. The service offered by the Enterprise brand is automobile rentals – that service is exclusively provided by the operating subsidiaries. Defendant parent would otherwise have to undertake the business of the operating subsidiaries, but for their existence. The operating subsidiaries receive guidance in the form of instructional operating procedures from defendant parent, and if an operating subsidiary wishes to deviate from the procedures, there is a protocol that must be followed.

Defendant parent counters that there is a high threshold for exercising personal jurisdiction over a parent corporation pursuant to the alter-ego theory. ERAC-Missouri argues that much of the evidence Hickton asserts pursuant to the relevant factors does not demonstrate an unusual degree of control over the operating subsidiaries. It contends that the evidence is common with standard parent-subsidiary relationships.

### a. Persuasive Decisions

As already explained, the alter-ego test looks to whether "'the degree of control exercised by the parent is greater than normally associated with common ownership and directorship'" and whether "'the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent.'" Action Mfg. Co. v. Simon Wrecking Co., 375 F. Supp. 2d 411, 422 (E.D. Pa. 2005) (quoting Directory Dividends, 2003 WL 21961448, at *3). Two decisions from district courts within the Third Circuit shed light on the appropriate alter-ego analysis given the economic realities of twenty-first century business: In re Latex Gloves Products Liability Litigation, 2001 WL 964105, at *1, and In re Chocolate Confectionary Anti-Trust Litigation, 641 F. Supp. 2d 367 (M.D. Pa. 2009) ("Chocolate Confectionary II").

In re Latex Gloves Products Liability Litigation involved a corporation that developed and manufactured healthcare products. The parent created a subsidiary corporation that sold and marketed latex gloves, and that subsidiary corporation itself owned secondary subsidiaries that manufactured the gloves. In re Latex Gloves Prods. Liab. Litig., 2001 WL 964105, at *1. The boards of the parent and all subsidiaries consisted of the same three individuals, who transacted business in writing as opposed to holding in-person meetings. The parent's board on occasion would buy and sell assets for the subsidiary corporation that sold and marketed gloves. The parent and the subsidiary corporation shared a payroll department, and healthcare benefits for the parent's employees were provided by the subsidiary corporation. Id. at *1. Financial statements and annual shareholder reports were consolidated. Id. at *2.

In applying the alter-ego test and analyzing the ten factors, the court held that the subsidiary corporation was an alter ego of the parent. The court found significant that not only did the parent have the ability to control the subsidiary corporation, but deposition testimony suggested that the parent exercised this control and the parent and subsidiary corporation functioned as a single company. They portrayed themselves as a single company to the public. Id. at *4. The court acknowledged that supervision of finances and articulation of general policies is not enough to confer jurisdiction, but noted that the parent approved all financial expenditures of the subsidiary corporation. Id. at *4 n.13. The structure of the subsidiaries was key. They operated vertically as "strategic business units." Id. at *6. There was "evidence that the strategic business units cut managerially across corporate lines from the parent through the subsidiaries." Id. at *6 n.18. For example, one of the subsidiary corporation's employees was the managing director of a secondary subsidiary's manufacturing plant, with the power to hire and fire plant employees. Id. at *6.

In Chocolate Confectionary II, three defendants moved to dismiss for lack of personal jurisdiction. One defendant was the Canadian subsidiary of the global parent. The parent resided in the forum. The Canadian company transferred profits to the parent by dividends and capital repatriations. Chocolate Confectionary II, 641 F. Supp. 2d at 373-74. The parent established accounting protocols, required that it approve the annual budgets and capital expenditures in excess of $500,000, and issued a "Recurring Reports Manual" which governed the format of financial reports subsidiaries were required to submit. Id. at 373-74, 386. The parent issued a "Finance Manual" that articulated broad pricing principles applicable to the Canadian subsidiary's transactions. Id. at 374-75. Approximately 85% of the subsidiary's products were exported out of Canada, with the majority being exported to the United States. Id. at 374.

The court held that the Canadian subsidiary was not an alter ego of the parent. With respect to the accounting, finance, and sales protocols, the court emphasized that "[u]niformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency, and imposition of mandatory financial reporting does not divest subsidiaries of control over daily operating activities." Id. at 386. The court found noteworthy the language in the finance manual distributed to subsidiaries encouraging them to "var[y] . . . the way in which corporate principles are applied in practice," and to implement operating plans "at the local level." Id. at 387. The subsidiaries were "very autonomous," and although "linked by global brands," they "would actually operate and market [their] products at the local level." Id. Also important was the assumption of responsibility for operations and administration by the subsidiary's managers. These managers did not supervise employees of other subsidiaries or "manage activities beyond the auspices of their employing corporation." Id.

Since the Canadian subsidiary and the parent were not alter egos, the court proceeded to analyze whether general jurisdiction existed over the subsidiary based upon its contacts with the forum. The court held that the Canadian subsidiary's export activity to the forum was not sufficient, because the Canadian subsidiary merely entered into arms-length transactions to sell the goods to an independent subsidiary. The Canadian subsidiary had no control over the other subsidiary's distribution activities, and the product transfers represented "passive dissociation from the [forum] market rather than jurisdictional engagement with it." Id. at 388. Neither the Canadian subsidiary's ratification of licensing agreements entered into by subsidiaries located within the forum nor the purchase of raw materials from the forum, even at regular intervals, was sufficient to confer general jurisdiction. Id. at 389. Eighty-five trips to the forum over a seven-year span by the Canadian subsidiary's executives for purposes of attending board meetings, conferences, and training were insufficient. Id. at 390.

A second defendant was a holding company and ultimate parent of a group comprised of fifty-two operating entities. Although two immediate subsidiaries held legal title to trademarks and patents, the parent was the beneficial owner and licensor of all intellectual property. In exchange for granting licenses to operating entities, the parent received royalty payments. Id. at 375. Executives of the parent made frequent trips to the forum to participate in acquisition activity and joint ventures. The parent managed products, brand images, and operations through strategic business units that were "constructed around product lines rather than along geographic or corporate boundaries." Id. at 376. Examples of product lines were confectionary, frozen foods, and pet care products. One unit was specifically assigned responsibility for designing promotional campaigns, conducting market research, and developing strategies for product placement. Id. at 376-77. There was evidence, however, that one of the two immediate

subsidiaries controlled the strategic business units. The operating subsidiaries had discretion to reject programs recommended by the units, and the operating subsidiaries created separate strategic business units that did not necessarily overlap. For example, the subsidiary within the forum had a unit for beverages, for which there was no counterpart. Id. at 392-93. The parent maintained a system used to aggregate "financial, marketing, sales, and supply data . . . , and group entities use it for a multitude of corporate functions, from cataloguing financial data to analyzing supply chain efficiency." Id. at 377. The operating entities retained all responsibility for the manufacturing, sales, and marketing processes. Id.

The court held that the operating subsidiary within the forum was not the alter ego of the parent. Id. at 391-95. The court noted that the "mere presence of contractual ties between two related corporations does not meld into them a single entity," and "[t]hat some of those benefits pass from [the operating entity] to [the parent] in the form of royalties rather than dividends sheds little light on the control that [the parent] exercises over [the operating entity]'s operational affairs." Id. at 392 n.36. The parent's executive officers did not "manage the day-to-day operations" of the subsidiary, and the operating subsidiary exercised "a significant degree of autonomy over its daily affairs," maintained "its own production facilities, purchase[d] raw materials through contracts to which [the parent was] not a party, formulate[d] its own budget, and establishe[d] its own administrative policies." Id. at 395.

With respect to general jurisdiction, the court rejected the plaintiffs' argument that the parent had continuous and systematic contacts with the forum based upon a licensing arrangement between one of the primary subsidiaries and a corporation located within the forum, royalties the parent received from operating subsidiaries within the forum, travel by the parent's

executives to the forum, events the parent held within the forum to entice investors, or the parent's engagement in merger transactions with forum corporations. <u>Id.</u> at 396-99.

The third defendant, the ultimate parent corporation of a group, managed the affairs of subsidiaries through a matrix organizational structure. Part of this structure was a panel organized by the parent that had responsibility "for the day-to-day management of the operations and the implementation of strategy." <u>Id.</u> at 378. The panel was comprised of the heads of strategic business units, and these heads also served as chief executives of the operating subsidiaries. The executives of the subsidiaries were responsible for their own subsidiary's manufacturing activities, and also were responsible for management of the group's international operations through the panel. The parent's chief executive officer was an employee of a subsidiary corporation located within the forum. <u>Id.</u> The matrix structure allowed the panel to transfer personnel from one subsidiary to another, and the transferred employee, while employed by the transferee subsidiary, retained benefits and seniority accrued from the transferor subsidiary. <u>Id.</u> at 379.

The court held that the plaintiffs produced prima facie evidence that the subsidiary within the forum was the alter ego of the third defendant. <u>Id.</u> at 400-05. Similar to the second defendant, the parent vertically managed the group through strategic business units aligned with product groups rather than corporate boundaries, but unlike the second defendant, oversight of each unit was the responsibility of an executive of one of the operating subsidiaries. For example, the chief executive officer of the forum's operating subsidiary was also the head of a strategic business unit, and he was responsible for that unit's products regardless whether his subsidiary produced them. <u>Id.</u> at 401. The parent in essence "conscripted employees of their subsidiaries to discharge group-wide management functions across corporate boundaries." <u>Id.</u>

The parent's establishment of the panel, which controlled the daily functions of the operating subsidiaries "to the exclusion of their respective boards of directors" or managers, was also critical.  Id. at 402.

### b. Application of the Alter-Ego Factors

The sharing by the corporations of directors and the ownership by defendant parent of one-hundred percent of ERAC-Pittsburgh's stock do not implicate that defendant parent controlled the subsidiary to the extent necessary to find that ERAC-Pittsburgh is an alter ego of defendant parent.  A degree of control naturally flows from these aspects of the parent-subsidiary relationship, but this incidental control does not rise to the level required to permit the exercise of jurisdiction over the parent.  See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp., 751 F.2d 117, 120 (2d Cir. 1984)  ("officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over the subsidiary corporation and the discharge of that supervision alone is not enough to subject the parent to . . . jurisdiction").  In Chocolate Confectionary II, the court stated that these kind of corporate arrangements

> reflect a parent corporation's control over certain aspects of its subsidiary's business but fall short of that required for a finding of alter ego status. . . .  As the controlling shareholder of [the subsidiary], [the parent] is entitled to ordain [the subsidiary]'s officers and directors, influence executive compensation, approve budgets, gather information about corporate performance, and receive distributions of subsidiary profits.

Chocolate Confectionary II, 641 F. Supp. 2d at 386.  "A parent corporation is entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries, and reap financial benefits from their profits."  Id. at 394.

The recommendations and best practices suggested by defendant parent in this case do not rise to the level of control to establish an alter-ego relationship.  In Chocolate Confectionary

II, a division of the second defendant (a parent corporation) formulated "guidelines and best practices," which it distributed to operating subsidiaries. The court stated that "[b]y definition, these instructional resources are not corporate mandates." Id. at 393.

The common marketing image and joint use of trademarked logos fail to render ERAC-Pittsburgh an alter ego of ERAC-Missouri. Enterprise Rent-A-Car is portrayed as a single brand to the public, but this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries. See Seiko Epson Corp. v. Print-Rite Holdings, Ltd., No. 01-500, 2002 WL 32513403, at *15 (D. Or. Apr. 30, 2002) ("The Court, therefore, finds the Group's public image offers some evidence of the parties' true relationships . . . . The Group's marketing image, however, is only probative insofar as it is proof of the actual relationship between the parties. This evidence alone is insufficient to justify disregarding the general rule of corporate distinctions . . . .").

The use of an integrated sales system and use of services from defendant parent's IT and HR departments likewise are not sufficient. These characteristics of this parent-subsidiary relationship merely show the resources defendant parent provided to its operating subsidiaries, but they do not show a high-level of operational control over the operating subsidiaries. In Chocolate Confectionary II, the court held that the second defendant's implementation of an IT system, named GLOBE, did not render the subsidiary the parent's alter ego.

> Use of the GLOBE system to achieve these ends is of little jurisdictional moment. Implementation of IT systems such as GLOBE is a ubiquitous practice in the modern business landscape, where investors and managers require access to instantaneous data in order to analyze the vacillation of revenue and expense. Utilization of such systems does not establish alter ego jurisdiction, particularly when a parent has implemented them to further activities–such as data collection and subsidiary oversight–that are inconsequential to the court's Rule 12(b)(2) analysis. The doctrine of general jurisdiction does not require a corporation to eschew

technological advances to avoid being haled into court, and [the parent]'s reliance on the GLOBE system does not represent jurisdictionally meaningful contact with the [forum].

Id. at 394.

With respect to whether defendant parent would have to perform the business functions of the operating subsidiaries if not for their existence, the court notes that in the case of holding companies, "'the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company could simply hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper.'" Action Mfg., 375 F. Supp. 2d at 422 (quoting Gallagher v. Mazda Motor of Am., Inc., 781 F. Supp. 1079, 1085 (E.D. Pa. 1992)).

The court finds that the operating subsidiary ERAC-Pittsburgh is not the alter ego of defendant parent. The evidence pointed to by Hickton fails to show defendant parent exercised "any control over the internal workings or day-to-day operations of its subsidiaries." Hoffman v. Tyco Int'l, Ltd., No. 06-2961, 2006 WL 3759709, at *5 (E.D. Pa. Dec. 18, 2006). The evidence of record considered as a whole does not reveal an extraordinary level of control of defendant parent over ERAC-Pittsburgh, other than the kind of control associated with parent-subsidiary relationships.

The court recognizes that, in the aggregate, ERAC-Missouri may provide a higher number of services to its operating subsidiaries than the number of services provided by the parent entities in Chocolate Confectionary II. The court notes that this difference in part is a consequence of the nature of the respective industries. The car rental industry is a service industry, in which the fundamental business transactions are entered into between the subsidiary and the consumer. ERAC-Missouri provides services that aid these transactions. The defendants

in Chocolate Confectionary II engaged in an industry involved with the production and sale of a good. In that particular industry, a complex network of wholesalers and distributors existed between the producers and consumers. In both In re Latex Gloves Products Liability Litigation and Chocolate Confectionary II there were numerous facts tying the parent to the subsidiary, such as common ownership and the provision of administrative services. A key fact in those cases that resulted in the finding of alter-ego jurisdiction was the failure to adhere to corporate boundaries. In re Latex Gloves Prods. Liab. Litig., 2001 WL 964105, at *6; Chocolate Confectionary II, 641 F. Supp. 2d at 401; see Volkswagenwerk Aktiengesellschaft, 751 F.2d at 120 (under New York's long arm jurisdiction statute, "when the activities of the parent show a disregard for the separate corporate existence of the subsidiary," personal jurisdiction may be asserted). This key factor was particularly evidenced in Chocolate Confectionary II, in which the court found alter-ego jurisdiction did not exist over the two defendants who operated within the established corporate structure, but found alter-ego jurisdiction existed over the defendant that failed to do so. Chocolate Confectionary II, 641 F. Supp. 2d at 386-87, 391-95, 400-05.

In both In re Latex Gloves Products Liability Litigation and Chocolate Confectionary II, the failure to adhere to corporate boundaries was demonstrated by the exercise of managerial power over the operations and functions of one subsidiary or group of subsidiaries by employees of a separate but affiliated corporation. In re Latex Gloves Prods. Liab. Litig., 2001 WL 964105, at *6; Chocolate Confectionary II, 641 F. Supp. 2d at 401. In this case, there is no evidence of a failure to operate within the corporate structures established among the Enterprise Rent-A-Car companies. This court cannot exercise in personam jurisdiction over ERAC-Missouri in this case based upon the alter-ego theory.

### 3. Specific Jurisdiction

Specific jurisdiction involves the situation where the claim arises out of or is related to a defendant's contacts with the forum state. Jarzynka v. St. Thomas Univ. Sch. of Law, 323 F.Supp.2d 660, 663 (W.D. Pa. 2004). In O'Connor II, the Court of Appeals for the Third Circuit explained there is a three-part analysis for determining whether specific jurisdiction exists: (1) the defendant must have purposefully directed its activities at the forum; (2) the litigation must arise out of or relate to at least one of those activities; and (3) if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice. O'Connor II, 496 F.3d at 317.

Hickton argues specific jurisdiction exists, for many of the same reasons that he argues in personam jurisdiction exists under general jurisdiction and the alter-ego theory. He argues ERAC-Missouri purposefully directed its activities to Pennsylvania, because of the control it exerted over ERAC-Pittsburgh. This control, Hickton argues, affected the employment decisions related to the compensation of the subsidiary's managers. The litigation arises out of that decision. Hickton argues that the exercise of specific jurisdiction would be consistent with traditional notions of fair play and substantial justice, and that based upon ERAC-Missouri's business connections with the Pennsylvania, it would not suffer unfair surprise by being sued in that forum.

Defendant parent argues in response that ERAC-Missouri has no contacts whatsoever with Pennsylvania, and, to the extent ERAC-Missouri has contacts, the contacts are irrelevant to Hickton's claims. Defendant parent urges the court to conclude the claims arise totally out of Hickton's employment with and compensation from ERAC-Pittsburgh.

Specific in personam jurisdiction would exist over ERAC-Missouri in this case, if ERAC-Missouri was the sole employer of branch managers and assistant branch managers. Although ERAC-Missouri is not the sole employer of Hickton, he argues that ERAC-Missouri is a joint employer. Several courts have held that the determination of specific jurisdiction over a defendant depends upon whether that defendant is a joint employer.

In <u>Willshire v. HK Management</u>, No. 3:04-CV-0090B, 2004 WL 2974082, at *3 (N.D. Tex. Dec. 16, 2004), the plaintiff was a crew member of the band Aerosmith, and she alleged she was sexually harassed in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e <u>et seq.</u> ("Title VII"). She sued several management companies who handled different aspects of the band's tours. HK Management moved to dismiss for lack subject-matter jurisdiction, arguing it was not the plaintiff's employer. HK Management also moved to dismiss for lack of personal jurisdiction, arguing it did not have minimum contacts with the forum state, Texas. <u>Id.</u> at *1. The court held it had subject-matter jurisdiction over the plaintiff's claims, since the plaintiff alleged HK Management controlled her employment and was thus a joint employer. <u>Id.</u> The court held that HK Management's occasional scheduling of concerts in Texas did not create continuous and systematic contacts to establish general jurisdiction. <u>Id.</u> at *2. With respect to specific jurisdiction, the court observed:

> [The plaintiff]'s argument in support of specific jurisdiction is that she was employed by HK Management, who scheduled concerts in Texas, at which time she was sexually harassed. HK Management does not deny scheduling concerts in Texas, so the issue of specific jurisdiction turns on whether or not HK Management was [the plaintiff]'s employer. . . .
> This issue is further complicated by the fact that no discovery had been conducted at the time [the plaintiff] was required to file a response to HK Management's Motion to Dismiss, and judging from other documents filed with the Court, HK Management has refused to engage in any discovery to date. . . . This Court, on such a limited record, cannot make the fact

intensive determination of whether HK Management was a joint employer of [the plaintiff]. Taking all inferences in favor of [the plaintiff], the Court finds that [the plaintiff] has presented prima facie evidence of an employment relationship, which would lead to specific jurisdiction in Texas.

Id. at **2-3.

Bishop v. Consolidated Natural Gas, Inc., No. 99-1363, 2000 WL 6263, at *3 (E.D. La. Jan. 5, 2000), involved issues similar to those raised in Willshire. The court stated "specific jurisdiction would be triggered if [the moving defendant] were a joint employer and played an integral role in denying [the plaintiff] the promotional opportunity at issue in this employment discrimination lawsuit." Id.

Although the courts in those decisions held that specific jurisdiction turns on whether the defendant is a joint employer, other courts have held that the joint employer analysis is irrelevant to personal jurisdiction.

In Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp., 230 F.3d 934 (7th Cir. 2000), a trucking company contributed on behalf of its employees to a multiemployer pension plan (the "fund") pursuant to a collective bargaining agreement. The trucking company went out of business. Under the Multiemployer Pension Plan Amendments Act of 1980 to ERISA, 29 U.S.C. § 1383("MPPAA" or the "act"), this situation constituted a withdrawal, and the trucking company incurred withdrawal liability under the act. Id. at 937-38.

The MPPAA provides that all businesses under common control are jointly and severally liable for the withdrawal of an affiliate. The fund sued the trucking company and a holding company that owned all stock of the trucking company in federal district court in Illinois. The holding company, which was a Canadian corporation, moved to dismiss for lack of personal jurisdiction. Id. at 938.

The fund asserted that the district court could exercise specific personal jurisdiction over the holding company. The fund recognized that the general rule was that corporate ownership by itself is not enough to establish personal jurisdiction, but it argued that the principle did not apply in the context of withdrawal liability under the MPPAA since the act provides that "all businesses under common control shall be treated as a single entity." Id. at 943. The Court of Appeals for the Seventh Circuit rejected this argument. It stated:

> The fund's argument that this analysis changes where a federal statute premises liability on corporate affiliation ignores the process by which courts determine whether specific personal jurisdiction exists and confuses liability and jurisdiction. To decide whether specific personal jurisdiction may be exercised, a court must engage in three distinct steps in the following order: (1) identify the contacts the defendant has with the forum; (2) analyze whether these contacts meet constitutional minimums and whether exercising jurisdiction on the basis of these minimum contacts sufficiently comports with fairness and justice; (3) determine whether the sufficient minimum contacts, if any, arise out of or are related to the causes of action involved in the suit. If the court determines at the second step that a defendant does not have sufficient minimum contacts with the forum, then its personal jurisdiction analysis ends without examining the plaintiff's causes of action. The laws on which the suit are based would be irrelevant because a state or federal statute cannot transmogrify insufficient minimum contacts into a basis for personal jurisdiction by making these contacts elements of a cause of action, since this would violate due process. The fact that a defendant would be liable under a statute if personal jurisdiction over it could be obtained is irrelevant to the question of whether such jurisdiction can be exercised. MPPAA's definition of corporate affiliation as an element of withdrawal liability cannot confer personal jurisdiction on the basis of such affiliation . . . . Thus, MPPAA's control group provision regarding withdrawal liability does not alter the rule that corporate affiliation or ownership is not a sufficient minimum contact for the exercise of personal jurisdiction.

Id. at 944-45.

In Vogt v. Greenmarine Holding, LLC, No. 1:01-CV0311JOF, 2002 WL 534542, at *1 (N.D. Ga. 2002), former employees of a manufacturer of marine engines sued for violations of

the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C. §§ 2101-09, which requires that employers provide sixty days' advance written notice of a plant closing or mass layoff. The plaintiffs sued the manufacturer and several holding companies that owned the manufacturer. Id. at *1. Several of the holding companies moved to dismiss for lack of personal jurisdiction. In response, the plaintiffs argued that jurisdiction depended on whether the holding companies were joint employers, but the court disagreed.

> Plaintiffs argue that the proper test for personal jurisdiction is whether [the manufacturer] and [the holding companies] constitute a "single employer" so as to be liable under WARN. The court finds, however, that it is improper to conflate an issue of subject matter jurisdiction with personal jurisdiction. Liability and jurisdiction are two separate inquiries.

Id. at *3. The court cited the Central States' holding that the analysis of personal jurisdiction is not altered where a federal statute premises liability on corporate affiliation. Id.

One other decision indirectly touching on the subject is United Electrical, Radio & Machine Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1096 (1st Cir. 1992). The Court of Appeals for the First Circuit stated in dicta:

> In a final, apopemptic effort to salvage their victory below, plaintiffs contend that . . . jurisdiction over [the defendant] was nonetheless exercisable under an "integrated enterprise" theory. Whatever the cogency of this asseveration–and we are highly skeptical of its merits in light of the conspicuous lack of support in the case law for transplanting this theory from the liability context to the jurisdictional context–the plaintiffs have forfeited the opportunity to seek appellate review of this contention.

Id. at 1096.

The court is persuaded by the latter group of decisions in which the courts recognized that the joint employer theory and similar concepts are relevant for determining liability, but are not for determining whether a court may exercise personal jurisdictional over a party. Since the

joint employer issue is not relevant to the specific jurisdiction analysis, the court will analyze

defendant parent's contacts under the three-part analysis used by the Court of Appeals for the

Third Circuit in O'Connor II.[17]

During oral argument, Hickton's counsel argued Adams testified at his deposition that

defendant parent's recommendations were universally implemented, implying that the so-called

recommendations were mandatory orders, which are purposefully-directed activities toward

Pennsylvania from which this lawsuit arises. Defendant parent countered that Nettles

unequivocally testified at his deposition that he made the relevant employment decisions, and

was not unduly influenced by defendant parent.

The court finds that the issue with respect to specific jurisdiction issue is a close question.

In Langlois v. Deja Vu, Inc., 984 F. Supp. 1327, 1342 (W.D. Wash. 1997), the court was

presented with a situation similar to that presented in this case. One out-of-state entity provided

consulting services on employment matters to related entities, and one of the in-state related

entities allegedly employed the plaintiffs. Those services were communicated via "flash"

memoranda. Id. at 1341. The plaintiffs brought FLSA actions. In Langlois, there was

deposition testimony that some of the affiliated entities, including one in the forum, did not

receive the memoranda. There was also testimony that the affiliated entities had discretion to

reject following the memoranda. Id. at 1342. The court explained that if

> the flash memoranda provided by [the one entity] were only for
> informational purposes, then [the one entity's] contacts would
> appear to be fortuitous, and not purposeful. If a contract standing
> alone is insufficient to indicate a purposeful contact (see Burger
> King), then surely a contact which is at most advisory in nature
> cannot amount to a purposeful contact.

---

[17] The parties completed discovery and briefed the joint employer issue in the context of ERAC-Missouri's motion for summary judgment. For the reasons explained in Part V of this memorandum opinion, the court grants ERAC-Missouri's motion for summary judgment on joint employer issues.

Id.  The court, however, found that the plaintiffs presented prima facie evidence that specific

jurisdiction existed:

> Despite [the one entity's] arguments, it appears, on the whole, that
> a genuine issue exists regarding whether [the affiliated entities]
> were contractually required to utilize the information provided by
> [the one entity]. One could reasonably infer that [the affiliated
> entities] were required to follow the memoranda from the fact that
> consulting agreements were in place with [the affiliated entities],
> [the one entity] received fees from the agreements based on [its]
> work performed, and the . . . leases were adopted by [the affiliated
> entities] and revised. Most importantly and regardless of whether
> [the affiliated entities] were actually required to use the
> information, Plaintiffs have presented a prima facie case in support
> of an inference that [the one entity] could reasonably foresee–
> based on its consulting agreements with [the affiliated entities] and
> the employment advice it gave pursuant to those agreements–that it
> might be subject to having to defend a lawsuit in Washington
> based on those contacts.

Id.  The court denied the motion to dismiss for lack of personal jurisdiction.  Id. at 1331-32.

If ERAC-Missouri's recommendations were purely informational, then ERAC-Missouri

could not be found to have purposefully availed itself of the protections and benefits of

Pennsylvania law.  Under those circumstances, the court could not conclude that there was

evidence sufficient to satisfy the first part of the analysis set forth in O'Connor II.  On the other

hand, if the rationale of Langlois is followed, there is a genuine issue of fact and, since no

evidentiary hearing was held, the court would need to find plaintiffs presented a prima facie case

supporting specific jurisdiction.  The facts of this case present complex issues which may need

an evidentiary hearing to resolve whether personal jurisdiction in fact exists over ERAC-

Missouri.  To streamline the decision making, courts, in situations where complex issues of

personal jurisdiction exist and there is a pending motion which would be dispositive in favor of

the party over whom jurisdiction is disputed, may defer ruling on the motion to dismiss and

proceed to resolve the dispositive motion.  "[W]hen the jurisdictional question is complex or

difficult, a court simply may avoid the issue by resolving the suit on the merits when they clearly

must be decided in favor of the party challenging jurisdiction, thereby obviating any need to

decide the question . . . .”  4 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE

AND PROCEDURE § 1067.6 at 553 (3d ed. 2002); see Lee v. City of Beaumont, 12 F.3d 933, 937

(9th Cir. 1993), overruled on other grounds by California Dept. of Water Resources v. Powerex

Corp., 533 F.3d 1087, 1091 (9th Cir. 2008).  This court will follow that approach because the

motion for summary judgment, which has been fully briefed, will be granted in favor of ERAC-

Missouri.  Under those circumstances, the motion to dismiss for lack of personal jurisdiction will

be denied without prejudice.


**D. Motion to Dismiss With Respect to Averill**

**1. General Jurisdiction**

Averill argues ERAC-Missouri engages in calculated activities in and directed toward

Illinois.

**a. Prior Lawsuit in the Forum – Judicial Estoppel**

Averill argues ERAC-Missouri’s prior conduct contradicts its own argument with respect

to in personam jurisdiction.  Averill argues ERAC-Missouri initiated a lawsuit in August 2004 in

the Northern District of Illinois against Collision Industry Management Solutions, claiming

trademark infringement based upon the use of the “ARMS” trade name.  In the complaint,

defendant parent openly stated it was conducting business and operating locations in Illinois.

Defendant parent has registered trademarks and service marks with the Illinois Secretary of State

since 1957; the registration for one of the marks is set to expire in 2012.

Defendant parent argues that the complaint filed in the Northern District of Illinois was unartfully drafted, and should have stated that authorized *users* of the trademark conduct business in Illinois. Defendant parent argues registration or enforcement of a trademark is not significant to the analysis of minimum contacts. It also argues the common trade name and branding strategy is incidental to the parent-subsidiary relationship.

Defendant parent is not judicially estopped from challenging an Illinois court's jurisdiction over it, even though it stated in the prior lawsuit that it "operates a large number of locations in the Northern District of Illinois." (Pl.'s Br. Averill, Ex. 1 at P0002.) Judicial estoppel precludes a party from asserting a position inconsistent with positions previously asserted, if the inconsistency is intentional and is "'used as a means of obtaining unfair advantage.'" Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 362 (3d Cir. 1996) (quoting Scarano v. Central R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)). There are three elements necessary for the imposition of judicial estoppel: (1) the party to be estopped must be asserting a position that is irreconcilably inconsistent with the position that party asserted in a prior proceeding; (2) the party changed his or her position in "bad faith"; and (3) the use of judicial estoppel must be "tailored to address the affront to the court's authority or integrity." Montrose Med. Group Participating Sav. Plan v. Bulger, 243 F.3d 773, 777-78 (3d Cir. 2001). Here, there are no allegations that defendant parent acted with intent to manipulate the courts. In New Hampshire v. Maine, 532 U.S. 742, 753 (2001), the Supreme Court stated: "We do not question that it may be appropriate to resist application of judicial estoppel 'when a party's prior position was based on inadvertence or mistake.'" Id. (quoting John S. Clark Co. v. Faggert & Frieden, P. C., 65 F.3d 26, 29 (4th Cir. 1995)). Counsel for defendant parent represented that the complaint in the action brought against Collision Industry Management Solutions inadvertently

referred to defendant parent as operating locations in Illinois. Averill presented no evidence to contradict this representation of defendant parent's counsel. In addition, Averill did not present evidence or argue that ERAC-Missouri changed its position in bad faith. Under those circumstances, judicial estoppel does not apply.

One could argue that defendant parent's previous representations should be addressed as judicial admissions. The factual allegations in the prior lawsuit, however, do not serve as a judicial admission that personal jurisdiction in this case is proper in Illinois or as consent to personal jurisdiction in Illinois. "'Judicial admissions are binding for the purpose of the case in which the admissions are made including appeals,'" but do not extend to other actions. Saudi v. Acomarit Mar. Servs., S.A., 245 F. Supp. 2d 662, 679 (E.D. Pa. 2003) (rejecting judicial admission in prior lawsuit for personal jurisdictional purposes in the pending lawsuit) (quoting Zapach v. Dismuke, 134 F. Supp. 2d 682, 693 (E.D. Pa. 2001)); see Sandstrom v. Chemlawn Corp., 727 F. Supp. 676, 678 (D. Me. 1989) (statements contained in a memorandum of law filed in a Pennsylvania case that defendant consented to jurisdiction in Maine does not bind defendant to jurisdiction in Maine in a different case).[18]

---

[18] The law of Texas provides that a statement in the pleadings of a certain case may be

> treated as a judicial admission [in a different case] when it appears: (1) the declaration was made during the course of a judicial proceeding; (2) the statement is contrary to an essential fact embraced in the declarant's theory of recovery or defense; (3) the statement is clear and deliberate, and not a mistake; (4) giving conclusive effect to the admission will not be contrary to the public policy on which the rule is based; and (5) the statement is not destructive of the offering party's theory of recovery.

DowElanco v. Benitez, 4 S.W.3d 866, 871 (Tex. App. 1999). Based upon this rule, the state courts of Texas have held that they can exercise in personam jurisdiction over individuals who have admitted facts in unrelated lawsuits that would deem jurisdiction in Texas proper. See, e.g., Daimler-Benz Aktiengsellschaft v. Olson, 21 S.W.3d 707, 719-20 (Tex. App. 2000); DowElanco, 4 S.W.3d at 871. The prevailing rule from other courts, however, is:

> While an admission made by a party in a pleading in the same case sometimes may be deemed binding as a "judicial admission," an admission made in a different case is not conclusively binding, unless judicial estoppel applies. One treatise explained the distinction in this way:

With respect to consent, in certain situations a party may be deemed to have consented to jurisdiction in a forum by bringing a lawsuit in that forum.  In General Contracting & Trading, General Contracting & Trading sued Interpole, a producer of wooden utility poles, in a federal district court for damages resulting from the untimely delivery of poles.  Interpole filed a third-party complaint against Trastco, the deliverer hired by Interpole.  Trastco did not respond, and an entry of default followed.  Trastco sought to set aside the default, but the court denied the request.  Trastco brought a separate action against Interpole in the same district court, claiming fraud and misrepresentation.  General Contracting & Trading, 940 F.2d at 21.  Trastco's action against Interpole settled before the district court held a hearing to determine damages for the third-party complaint in the initial action.  Damages were assessed in an amount greater than the amount Trastco received as part of the settlement of its action.  Id. at 22.

Trastco argued on appeal that the entry of default was void, because the district court did not have personal jurisdiction over it.  Id.  The Court of Appeals for the First Circuit rejected this argument, because Trastco either consented to personal jurisdiction or waived its personal

---

Judicial admissions must be distinguished from ordinary evidentiary admissions.  A judicial admission is binding upon the party making it; it may not be controverted at trial or on appeal.  Included within this category are admissions in the pleadings in the proceeding, stipulations and admissions pursuant to request to admit. . . .  *Ordinary evidentiary admissions, on the other hand, may be controverted or explained by the party.  Within this category fall pleadings in another proceeding*, superseded or withdrawn pleadings in the same proceeding, answers to interrogatories, as well as other statements admissible under [Federal Evidence] Rule 801(d)(2).

Hon. Barry Russell, Bankruptcy Evidence Manual, § 801:22 at 1507-08 (West 2008 ed.) (emphasis added) (citations omitted).

Gold v. Winget (In re NM Holdings Company,), 407 B.R. 232, 285-86 (Bankr. E.D. Mich. 2009); see Adkins Energy, LLC v. Farmland Mut. Ins. Co., No. 04 C 50482, 2009 WL 1259344, at *7 (N.D. Ill. May 6, 2009) (rejecting a request to deem as judicial admissions the allegations made in pleadings of a different case, because "a statement made in one lawsuit cannot be a judicial admission in another.").

jurisdiction protection.  Trastco purposefully availed itself of the benefits and protections of New

Hampshire courts by reason of its suit against Interpole:

> [I]t seems pellucidly clear that, by bringing Suit No. 2, Trastco submitted itself to the district court's jurisdiction in Suit No. 1. Trastco elected to avail itself of the benefits of the New Hampshire courts *as a plaintiff*, starting a suit against Interpole.  By so doing, we think it is inevitable that Trastco surrendered any jurisdictional objections to claims that Interpole wished to assert against it in consequence of the same transaction or arising out of the same nucleus of operative facts.  Indeed, given the common transactional core, Interpole's third-party complaint in Suit No. 1 stands in the same relation to Trastco's complaint in Suit No. 2 as would a counterclaim.  And, the Supreme Court has long recognized the inequity that would result if a plaintiff could raise jurisdictional objections to counterclaims filed by a defendant:
>
> > The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence.  It is the price which the state may exact as the condition of opening its courts to the plaintiff.
>
> Adam v. Saenger, [303 U.S. 59, 67-68 (1938)].

General Contracting & Trading, 940 F.2d at 23.

Consent is a traditional basis of jurisdiction that predates the minimum contacts analysis

set forth in International Shoe, and consent for purposes of personal jurisdiction may arguably be

upheld even in the absence of minimum contacts.  See 16 JAMES WM. MOORE, MOORE'S

FEDERAL PRACTICE § 108.53, at 108-95 (3d ed. 2009).  Although the Court of Appeals for the

Fifth Circuit apparently based the decision affirming the exercise of personal jurisdiction in

General Contracting & Trading upon a consent theory, the court of appeals in part addressed

specific jurisdiction by using language pertinent to that doctrine.  See Dow Chem. Co. v.

Calderon, 422 F.3d 827, 834-35 (9th Cir. 2005).

International Transactions, Ltd. v. Embotelladora Agral Regionmontana S.A. de C.V., 277 F. Supp. 2d 654 (N.D. Tex. 2002), involved the purchase by Sharp Capital of a promissory note from Agral, a Mexican distributor of cola products. Agral borrowed money to construct a bottling plant. The note purchased by Sharp Capital evidenced that debt and contained an arbitration clause. Agral defaulted, and Sharp Capital initiated arbitration proceedings. Id. at 658. Agral responded by filing two actions against Sharp Capital in the Northern District of Texas, seeking to join additional parties to the arbitration and compel arbitration before a different organization and asserting an affirmative claim against Sharp Capital on the basis of usury. After arbitration, an award of $11 million was entered in Sharp Capital's favor. One month later, Agral filed for bankruptcy. Sharp Capital's assignee sued in the North District of Texas to collect on the arbitration award, but Agral moved to dismiss for lack of personal jurisdiction. Id. at 659. Sharp Capital's assignee argued specific personal jurisdiction existed, and the district court agreed. Id. at 667. The district court stated that, under Texas law, "[v]oluntarily filing a lawsuit in a jurisdiction is a purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit when the lawsuits arise from the same general transaction." Id. (quoting Primera Vista S.P.R. de R.L. v. Banca Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin, 974 S.W.2d 918, 926 (Tex. App. 1998)).

The Court of Appeals for the Ninth Circuit in Calderon stated that the General Contracting & Trading and Embotelladora holdings

> rest primarily on the conclusion that there is nothing unfair, or violative of due process, about requiring a party that has affirmatively sought the aid of our courts with regard to a particular transaction to submit to jurisdiction in the same forum as a defendant with regard to the same transaction with the same party.

Calderon, 422 F.3d at 835.  The Court of Appeals for the Ninth Circuit in dicta stated that it did

not believe a party could demonstrate consent solely by filing an action in the forum; rather,

jurisdiction is based upon the International Shoe minimum contacts theory.  Id.

Averill argues that defendant parent's previous litigation in the Northern District of

Illinois is one of several contacts that establish continuous and systematic contacts with Illinois.

Averill does not advance a pure consent-based jurisdiction argument, and such an argument

appears doubtful for the reasons explained in Calderon.  Averill does not raise specific

jurisdiction on the basis of the prior litigation in the forum.  The circumstances of this litigation

indisputably arise out of circumstances separate and apart from those that form the basis of the

2004 lawsuit against Collision Industry Management Solutions.   Averill instead raises a general

jurisdiction argument.

Defendant parent's filing of a lawsuit would be significant to the analysis of specific

jurisdiction if the pending claims were related to the same matters that formed the basis of the

earlier lawsuit.  The claims in this lawsuit, however, are not related to those brought in the 2004

lawsuit against Collision Industry Management Solutions.

With respect to general jurisdiction, the court is not persuaded that the prior lawsuit is

significant to the general jurisdiction analysis.  There is no evidence of record that any action

took place in that case beyond the filing of a complaint.  A one-time occurrence or event is not

sufficient to establish general jurisdiction.  See Goodsport Mgmt. (USA), Inc. v. Special Events,

Inc., 71 F. Supp. 2d 477, 481 (E.D. Pa. 1999) (holding that a company's single contract to

provide hospitality services in Pennsylvania did not establish general jurisdiction with

Pennsylvania, where the company had no representatives or agents in Pennsylvania, did not own

or lease any real property there, did not have a telephone number, office, bank account or

mailing address there, did not advertise there, and the contract only accounted for only 0.6% of total annual gross sales). A single lawsuit filed years before the instant action, while it may establish a continuing connection to the forum for a limited period of time, does not meet the high standard that must be met in order for general jurisdiction to exist.

To the limited extent the prior lawsuit is relevant to the general jurisdiction analysis of substantial and continuous contacts, the court will consider it along with the other contacts noted by Averill, including defendant parent's registration of trademarks with Illinois through 2012.

### b. Other Contacts

Averill addressed other evidence in support of the court's exercise of general jurisdiction over defendant parent. Averill argues defendant parent's website is targeted at consumers in Illinois. Averill points out many of same characteristics of the website that Hickton focused upon. Averill additionally points out, however, that the website uses metatags that are directly aimed at Illinois residents. Averill notes that the website recruits employees to work at branch locations. Employees cannot apply directly with the branches, but rather must apply on ERAC-Missouri's website or contact the contact centers.

Averill argues defendant parent has contact with the employees of ELC-Chicago through the sponsorship and offering of employee benefits. ERAC-Missouri's policy manual defines "Employee" as that term relates to its benefit plans: "The employee is the person (who is not a dependent) on whose behalf the plan is established. Employees include *only the common-law employees of Enterprise*." (Pl.'s Br. Averill, Ex. 13 at P0181 (emphasis added).) Averill argues he is classified by ERAC-Missouri as an employee, and provided certain benefits based upon this status.

Defendant parent responds that website used for recruiting employees is hosted by an unaffiliated third-party recruiting firm, TMP Worldwide. Additionally, the website which provides employment applications is hosted by an unaffiliated third-party firm, iCIMS.com, Inc. The completed applications are distributed from the website directly to the appropriate subsidiary.

Defendant parent argues that the provision of employee benefit plans for use by subsidiaries is also immaterial to the analysis of general jurisdiction. Defendant cites <u>Abarca v. Manheim Services Corp.</u>, No. 05-3873, 2006 WL 850893, at *3 (N.D. Ill. Mar. 24, 2006), in which the court stated the employer's "activities in Illinois were not 'substantial' or 'continuous and systematic' by sponsoring a health and welfare plan that includes Illinois residents as participants and beneficiaries. These minimal activities with Illinois fail to establish general jurisdiction." <u>Id.</u> at *3. Defendant parent argues that the provision of benefits is just one of several services it offers to the operating subsidiaries, and that similar services are offered by parents in typical parent-subsidiary relationships.

The court finds that general jurisdiction over defendant parent does not exist, even viewing collectively all the contacts proffered by Averill. Many of the reasons for determining that general jurisdiction did not exist in Hickton's lawsuit also apply here. With respect to Averill's additional evidence, the court does not consider the employee benefit plans to be a substantial and continuous business activity in Illinois, for the reasons highlighted by defendant parent. The employment application features of the website, although interactive, do not directly target Illinois. The employment application features are not central to defendant parent's main business activities, which are the holding of stock or memberships in its subsidiaries and providing administrative services to its subsidiaries. Defendant parent is not a recruiter. The

metatags contained on the website, which are designed to generate hits on search engines when people search specifically for rental cars in Illinois, is relevant to the subsidiaries' businesses, but not defendant parent's business.  The registration of trademarks and service marks with Illinois through 2012 is also a contact with the state, but again this contact is not a substantial contact that would warrant the exercise of general jurisdiction.  <u>See</u> <u>Gen. Motors Corp. v. Ignacio Lopez de Arriortua</u>, 948 F. Supp. 656, 666 n.9 (E.D. Mich. 1996) (rejecting the argument the jurisdiction exists over the parent because it registered trademarks).   The court is not aware of any case law that provides for the exercise of general jurisdiction over a corporation that has merely registered its name or marks.  These contacts would be sufficient bases for the exercise of specific jurisdiction for any claims that would arise out of these contacts, but they do not meet the high threshold required for general jurisdiction.  As already mentioned, the significance of the prior lawsuit to the general jurisdiction analysis is limited.  Viewing all evidence of contacts with Illinois as a whole, ERAC-Missouri does not have substantial and continuous contacts with the Illinois that would permit a court of that forum to exercise personal jurisdiction.

### 2. Alter-Ego Theory

Averill argues that many of the same facts outlined in support of general jurisdiction also lead to the conclusion that jurisdiction over ELC-Chicago can be imputed to ERAC-Missouri.  He believes that those facts demonstrate control by the defendant parent over ELC-Chicago.  Averill presented an affidavit of Powell who, while attending a workshop ERAC-Missouri's St. Louis office, was told all business procedures and rules are developed and implemented by the St. Louis office.  The declaration of Powell, however, does not prove that defendant parent's recommendations were mandatory.  Adams, the architect behind the best practices guide,

testified that the subsidiaries were not compelled to adopt the recommendations set forth in the guide. Nettles, the general manager of ELC-Chicago, testified that he had sole authority over personnel decisions with respect to the subsidiary he oversaw, including decisions regarding payment of overtime.

Averill argues that ERAC-Missouri and ELC-Chicago shared many directors and officers. In response, defendant parent presented evidence that it maintained an ordinary parent-subsidiary relationship with ELC-Chicago and its other operating subsidiaries. The operating subsidiaries had separate corporate offices, maintained separate records, and had separate articles of incorporation and bylaws from defendant parent. Defendant parent received dividends and management fees from the subsidiaries for its services. The subsidiaries had authority for setting general business policies and day-to-day operations.

The court cannot find that ELC-Chicago is an alter ego of ERAC-Missouri. Just as the evidence presented warranted a finding that ERAC-Missouri and ERAC-Pittsburgh had a parent-subsidiary relationship which observes corporate formalities, the evidence presented warrants the same finding for the relationship between ERAC-Missouri and ELC-Chicago.[19]

### 3. Specific Jurisdiction

Averill argues that the action arises out of ERAC-Missouri's contacts with Illinois, relying on many of the contacts he highlighted in arguing that the exercise of general jurisdiction is proper. Defendant parent held itself out as Averill's employer for purposes of benefits, defendant parent required Averill to apply for employment on the website maintained by the parent, and defendant parent established the business practices, personnel policies, and benefit

---

[19] ELC-Chicago's change in structure to a limited liability company does not affect this analysis. Averill's employment ended before the change in structure.

plans applicable to Averill.  He also argues that defendant parent reserved the right to terminate his employment, and defendant parent maintained a centralized website, enterprise.com/ eracpeople, for employees to access benefits.  The court, however, cannot find evidence in the record that defendant parent specifically reserved or exercised the right to terminate the employment of individuals hired by the operating subsidiaries.  To the extent Taylor, Nicholson, or Snyder had authority to terminate employees of the operating subsidiaries, they held this authority indirectly in their roles as board members of the subsidiaries.

Defendant parent argues that the facts refute Averill's contention that he was employed by ERAC-Missouri.  Defendant parent relies upon an acknowledgment Averill signed, stating "I additionally acknowledge that unless specifically employed and assigned to the corporate headquarters, I am employed only by the subsidiary or affiliate where hired or assigned and not employed by the corporate parent or any other related or affiliated company."  (Ex. H to Def.'s Reply Averill.)  Defendant parent points to other language in ERAC-Missouri's best practices guide that stated: "Information contained in the . . . Benefit Summary Plan Description refers to employees of: The Crawford Group, Inc., Enterprise Rent-A-Car Company *and their various operating subsidiaries*." (Ex. 13 at P0157 to Pl.'s Br. Averill (emphasis added).)  Defendant parent presented evidence that it does not make compensation decisions for the operating subsidiaries.  (See Def.'s Br. Hickton, Ex. 3 ¶ 9; Def.'s Br. Hickton, Ex. 7 at 297.)

Similar to Hickton, the issue of specific jurisdiction is a close question, and the court will defer ruling upon the motion to dismiss by denying it without prejudice because the resolution of the summary judgment motion will be dispositive in favor of ERAC-Missouri.[20]

### E. Appropriate Relief With Respect to ERAC-Missouri's Motion to Dismiss

_____

[20] See to the analysis in Part IV.C.3. with respect to specific jurisdiction.

For the foregoing reasons, this court will defer ruling on the motion to dismiss by denying it without prejudice. The motion for summary judgment with respect to whether ERAC-Missouri is a joint employer for purposes of the FLSA is fully briefed. It is judicially efficient to resolve that pretrial motion now, because it is dispositive. For reasons explained in the remaining portion of this opinion, the court will grant ERAC-Missouri's motion for summary judgment. Since that motion is dispositive and no claims will remain against ERAC-Missouri, the court need not resolve the specific jurisdiction issue. Under those circumstances, the court will deny without prejudice ERAC-Missouri's motion to dismiss.

## V. Motion for Summary Judgment on Joint Employer Issues

### A. Standard of Review for Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Concrete evidence must be provided for each element of each of the claims, and the evidence must be such that a reasonable fact-finder could find in that party's favor at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" Orenge v.

<u>Veneman</u>, No. 04-297, 2006 WL 2711651, at *6 (W.D. Pa. Sept. 20, 2006) (citing <u>Celotex</u>, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. <u>Anderson</u>, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id.</u> at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. <u>Horta v. Sullivan</u>, 4 F.3d 2, 8 (1st Cir. 1993); <u>Pollack v. City of Newark</u>, 147 F. Supp. 35, 39 (D.N.J. 1956), <u>aff'd</u>, 248 F.2d 543 (3d Cir. 1957) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

### B. Discussion With Respect to Motion for Summary Judgment

In this multidistrict litigation, plaintiffs bring separate collective actions in various jurisdictions against a number of different operating subsidiaries and ERAC-Missouri under the FLSA. The FLSA is a remedial statute that should be "enforced to the fullest extent of its terms," <u>Hoffman-La Roche v. Sperling</u>, 493 U.S. 165, 173 (1989), and the statute "must be construed liberally to apply to the furthest reaches consistent with congressional direction," <u>Mitchell v. Lublin, McGaughy & Assocs.</u>, 358 U.S. 207, 211 (1959). The FLSA provides as a general rule that an employer shall not subject its employees to a workweek of more than forty hours, without compensating the employees at a special overtime rate.

> [N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods

> for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1).  The FLSA provides exceptions to this rule, however, for employees who are classified under one of several exemptions set forth in the FLSA.  See 29 U.S.C. § 213(a).

Plaintiffs were assistant branch managers and branch managers employed at various rental locations, and allege that they were wrongfully classified by their employers as exempt from certain federal and state wage law protections, including the requirement of premium overtime pay.  Plaintiffs claim that they regularly worked in excess of forty hours per week, without receiving premium overtime compensation for those hours worked that exceeded forty hours per week.  Because plaintiffs allege that, as managers, they were not exempt employees, and because defendants failed to pay managers premium overtime compensation for the hours worked in excess of forty hours per week, plaintiffs claim that their employers violated the FLSA.

In the pending motion, ERAC-Missouri moved for summary judgment with respect to plaintiffs' FLSA claims against it.  ERAC-Missouri argues that it did not employ any branch manager or assistant branch manager.  Instead, ERAC-Missouri argues that plaintiffs entered into employment relationships exclusively with ERAC-Missouri's operating subsidiaries.  Since plaintiffs were not employed by ERAC-Missouri, defendant parent argues it cannot be liable under the FLSA for any violations of the FLSA's provisions.

**C. Applicable Law With Respect to Motion for Summary Judgment on Joint Employer Issues**

To be held liable under FLSA, the defendant must be an "employer," which the statute defines as including "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). In this case, the parties do not dispute that plaintiffs were employed by the operating subsidiaries, but a "single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA]." 29 C.F.R. § 791.2(a). "A determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case." Id. ERAC-Missouri argues that the record lacks evidence to establish that it is a joint employer.[21]

"The doctrine of limited liability creates a strong presumption that a parent corporation is not the employer of its subsidiary's employees," and "[o]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary" is sufficient to establish a joint employer relationship. Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 778 (5th Cir. 1997). A court examines the "economic realities" in analyzing whether separate entities are joint employers. Watson v. Graves, 909 F.2d 1549, 1553 (5th Cir. 1990).

The Court of Appeals for the Third Circuit has not yet addressed the factors the court should consider in analyzing whether a joint employment relationship exists between a parent corporation and the employees of a subsidiary for purposes of FLSA claims. It discussed, however, joint employment in the context of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq., holding that two entities are joint employers if they "exert significant control over the

---

[21] Whether ERAC-Missouri is a joint employer, although dependent upon the facts, is a question of law, because it requires the court to draw a legal conclusion from the facts. See Karr v. Strong Detective Agency, Inc., 787 F.2d 1205, 1206 (7th Cir. 1986) ("the legal effect of those facts–whether [the defendants] are joint employers within the meaning of the FLSA–is a question of law").

same employees–where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." NLRB v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1124 (3d Cir. 1982). The court of appeals explained that a joint employment relationship requires "control of the terms and conditions of employment of the employees who are employed by the other employer." Id. at 1123.[22]

Defendants argue that the appropriate test to apply in determining the joint employer issue under the FLSA is similar to the test applicable to joint employment issues that arise in the context of employment discrimination laws, such as the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq. ("ADEA") – which notably incorporates the enforcement provisions of

---

[22] In Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985), the Court of Appeals for the Third Circuit considered whether a particular worker was an independent contractor or an "employee" within the meaning of the FLSA. ERAC-Missouri argues that the analysis applied in that decision should not apply in the parent-subsidiary context. In analyzing the issue in DialAmerica, the Court of Appeals for the Third Circuit looked at six factors:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

Id. (quoting Donovan v. Sureway Cleaners, 656 F.2d 1368, 1370 (9th Cir. 1981)). The Court of Appeals for the Second Circuit applied similar factors in determining whether a worker was an independent contractor or employee under the FLSA:

> (1) whether the premises and equipment of the purported joint employer are used for the plaintiffs' work; (2) whether the contractors had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the process of production for the purported joint employer; (4) whether responsibility under the contracts could pass from one subcontract to another without material changes; (5) the degree to which the purported joint employer or their agents supervised the plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the purported joint employer.

Zavala v. Wal-Mart Stores, Inc., 393 F. Supp. 2d 295, 329 (D.N.J. 2005) (citing Zheng v. Liberty Apparel Co., 355 F.3d 61, 72 (2d Cir. 2003)). The court agrees with ERAC-Missouri that factors such as those set forth in DialAmerica and Zheng are best applied to analyze joint employment issues in the context of independent contractors; whereas, the factors set forth in Lewis v. Vollmer of America, No. 05-1632, 2008 WL 355607, at *4 (W.D. Pa. Feb. 7, 2008), are best applied in the context of a parent-subsidiary relationship. Plaintiffs do not dispute that the Lewis factors should be analyzed in this situation.

the FLSA, see 29 U.S.C. § 626(b) – and Title VII.  In analyzing joint employer issues with respect to ADEA and Title VII claims, the court in Lewis v. Vollmer of America, No. 05-1632, 2008 WL 355607, at *4 (W.D. Pa. Feb. 7, 2008), considered three factors that all relate to control over employees: "'1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like.'"  Id. (quoting Cella v. Villanova Univ., No. 01-7181, 2003 WL 329147, at * 7 (E.D. Pa. Feb.12, 2003)).[23]

The factors examined in Lewis are consistent with the federal regulations promulgated by the Department of Labor.[24]  Section 791.2 of the FLSA regulations identifies three "situations" in which "a joint employment relationship generally will be considered to exist" if "the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek":

> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by

---

[23] The Lewis factors are virtually identical to those analyzed by the Court of Appeals for the Ninth Circuit in determining whether an employer-employee relationship exists: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  Bonnette v. California Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1981), abrogated on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 539 (1985).  The Court of Appeals for the First Circuit has applied these same four factors.  See Baystate Alternative Staffing, Inc., v. Herman, 163 F.3d 668, 675 (1st Cir. 1998).

[24] In Bonnette, the Court of Appeals for the Ninth Circuit recognized the three situations identified in § 791.2 of the federal regulations, and upheld the district court's application of factors akin to those set forth in Lewis.  Bonnette, 704 F.2d at 1470.

reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).[25]

---

[25] With respect to the applicable legal standards for this case, plaintiffs acknowledge the Lewis factors, but also advance arguments based upon (1) a "single employer" test, and (2) two opinion letters issued by the Department of Labor.

The "single employer" concept was discussed in Nesbitt v. Gears Unlimited, Inc., 347 F.3d 72 (3d Cir. 2003), in the context of a Title VII claim. The Court of Appeals for the Third Circuit in Nesbitt adopted the test laid out by the Court of Appeals for the Seventh Circuit in Papa v. Katy Industries, Inc., 166 F.3d 937 (7th Cir. 1999). The court in Papa analyzed the "integrated enterprise" test that was used by the National Labor Relations Board, and determined it was "unhelpful in the antidiscrimination context." Nesbitt, 347 F.3d at 85. Instead, the Court of Appeals for the Seventh Circuit set forth a test "tailored to Title VII's policy goals" concerning discrimination, which is known as the "single employer" test. Id. The test considers

three situations in the Title VII context when a company and its affiliates forfeit limited liability and thus are deemed a single employer: (1) where a company has split itself into entities with less than fifteen employees with the intent to evade Title VII's reach; (2) when a parent company has directed the subsidiary's discriminatory act of which the plaintiff is complaining; or (3) when a court would otherwise pierce the corporate veil ( i.e., look behind the corporate form to hold a corporation's shareholders personally liable).

Id. (citing Papa, 166 F.3d at 940-41). In this case, plaintiffs argued the second situation applies. This case, however, does not raise Title VII antidiscrimination issues. See Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 641 (2007), superseded by statute on other grounds, 42 U.S.C. § 2000e-5(e) ("an FLSA minimum wage or overtime claim does not require proof of a specific intent to discriminate"). The court is unaware of any decisions expanding the "single employer" test to FLSA overtime claims.

The Department of Labor opinion letters are dated January 7, 1986 (Pls.' App., Ex. 21), and April 11, 2005 (Pls.' App., Ex. 22). Opinion letters are "not binding precedent upon this Court." Platek v. Duquesne Club, 961 F. Supp. 835, 839 (W.D. Pa. 1995); see 29 C.F.R. § 531.25 ("The ultimate decisions on interpretations of the [FLSA] are [to be] made by the courts."). The January 7, 1986 letter stated that "[w]here one business entity controls another through total stock ownership, and/or interlocking directorates and common corporate officers, it has been held that employees of the latter are simultaneously employees of the former." (Pls.' App., Ex. 21.) The decisions cited in the letter to support that proposition, however, considered factors beyond mere ownership and board composition in finding that parent and subsidiary were joint employers, and looked at the power the parent exerted over the subsidiary. See, e.g., Wabash Radio Corp. v. Wailing, 162 F.2d 391, 394 (6th Cir. 1947) ("We bear in mind that the appellant is the railroad's wholly owned subsidiary, that the railroad defrays all expenses of the operation, carries the appellant's employees on its payroll, houses their operations in its railroad terminal, has these employees report to its own officials, and in all respects treats them as railroad employees."); Dolan v. Day & Zimmerman, 65 F. Supp. 923, 929 (D. Mass. 1946) (the parent "by and through its majority representation on the Board of Directors of Precision, and by its designation and controls of department heads and key personnel at Precision, did effectively manage and control the operations at Precision," and the parent was "actually in control of the internal management of Precision."). The letter dated April 11, 2005, also considered factors in addition to ownership and overlapping directors in determining that an employee of two different subsidiaries of a common parent holding company was jointly employed by the two subsidiaries. The letter notes that the human resources department of one subsidiary at times provided administrative support for the other, the parent's vice-president of human resources and several senior executives and senior managers had responsibility for more than one entity, the subsidiaries shared several personnel policies, the subsidiaries offered their employees a common health plan, and job vacancies in the subsidiaries were posted among themselves before being publicly advertised. (Pls.' App., Ex. 22.) Based upon the foregoing, the relevant considerations suggested in the January 7, 1986 opinion letter are comparable to the Lewis factors. It is a closer question with respect to the April 11, 2005 letter, but to follow the rationale in that letter would mean that virtually all typical parent-subsidiary relationships would subject the parent

**D. Analysis With Respect to Motion for Summary Judgment on Joint Employer Issues**

In Braden v. County of Washington, No. 08-574, 2010 WL 1664895, at *1 (W.D. Pa. Apr. 23, 2010), the plaintiff sued the Court of Common Pleas of Washington County and the County of Washington under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq. ("FMLA"), after she was discharged following a leave of absence due to a medical condition. The plaintiff alleged she was jointly employed by both the county and the court. Id. Partial summary judgment was granted in favor of the county. Id. at *9. The district court first noted that the joint employer standard for the FMLA mirrors the FLSA. Id. at *5. The plaintiff argued that the county was a joint employer with the court because the county was involved in payroll and benefits administration, it was present during the hiring process, its human resources department provided support to court-related employees, the court adopted or followed certain county policies, the county recommended that the plaintiff be suspended and fired, and the plaintiff's employment application read "Washington County" at the top. Id. at *7. The court rejected the plaintiff's arguments, stating that "[j]oint employer status, however, *does not turn on the perceptions of the employee*," and "providing human resource support is akin to an administrative function, and is not an exercise of the requisite control." Id. (emphasis added). The court observed:

> Here, there is no evidence that Defendant maintained direct or indirect control over Plaintiff's work schedules or working conditions, determined (rather than approved) the rate and method of her compensation, or had the power to determine, or take action, to hire or fire her. There is no evidence that Plaintiff or her supervisors reported to, or received direction or supervision from, Defendant. The evidence shows that the . . . Court adopted certain of Defendant's policies; there is no evidence that Defendant was

to joint employer status. That rationale has been rejected by several courts. See, e.g., Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226 (C.D. Cal. 2007).

empowered to impose or enforce those policies . . . .  In sum, there is absolutely no evidence that Defendant had any involvement in or control over Plaintiff's day-to-day work activities, or controlled the essential details of her employment. As the case law indicates, funding, and salary and benefits handling, are relevant but not enough.

Id.

In Maddock v. KB Homes, Inc., 631 F. Supp. 2d 1226 (C.D. Cal. 2007), the court considered similar issues.  In Maddock, the plaintiff, on behalf of herself and others similarly situated, sued the defendant for violating California's unfair business practice law.  The basis of this state law violation was the defendant's failure to pay overtime pursuant to the FLSA.  The defendant KB Home was a nationwide seller of homes in community developments, and the defendant had several subsidiaries in California, including KB Home Greater Los Angeles, Inc. ("KBLA").  The plaintiff was employed by KBLA as a sales agent, and she alleged that KB Home was a joint employer and improperly classified her as exempt under federal and state labor laws.  Id. at 1230.

KB Home moved for summary judgment, asserting that it did not employ the plaintiff and thus was not a proper party defendant.  KB Home asserted that KBLA was the employer.  Id. at 1232.  In making its determination whether the FLSA applied to KB Home, the court relied upon four factors set forth in Bonnette v. Health & Welfare Agency, 704 F.2d 1465, 1470 (9th Cir. 1981).  Maddock, 631 F. Supp. 2d at 1233; see supra note 23.

The court found that the first factor was not met.  The court observed that KBLA had the power to hire and fire sales agents, not KB Home.  Also, KBLA made the final decision to hire plaintiff.  With respect to the third factor, KBLA determined the compensation of its sales agents.  Thus, the third factor was not met.  With respect to the fourth factor, the court noted that it was met, because KB Home maintained a database of information regarding all of the

employees of the subsidiaries and the subsidiaries used the parent's shared payroll services. The court stated, however, that "these facts alone are as a matter of law insufficient to establish that KB Home was plaintiff's employer under the economic reality test." Id. at 1234.

The majority of the court's discussion revolved around the second factor – "whether KB Home supervised and controlled plaintiff's work schedule or conditions of employment." Id. KBLA, not KB Home, determined what training the employees would undergo. Although KB Home provided its subsidiaries training materials, procedures, and guidelines for sales agents, the subsidiaries were not required to impose these upon the sales agents. The plaintiff signed a salesperson employment agreement with KBLA that expressly provided the terms and conditions for her employment with KBLA. The court concluded that the second factor was not satisfied. Id. at 1234-35. Looking at all the factors together and considering other decisions from within the Ninth Circuit, the court held that KB Home was not a joint employer under the FLSA. Id. at 1237.

ERAC-Missouri argues that Braden and Maddock confirm that any *indirect* affects a parent company might have on the employees of a subsidiary, such as by recommending policies or providing training or support to the subsidiary, are not sufficient to make the parent a joint employer. See Braden, 2010 WL 1664895, at *7; Maddock, 631 F. Supp. 2d at 1234-35.

Plaintiffs in responding to the motion focused upon a number of facts. Plaintiffs explained that ERAC-Missouri owns the operating subsidiaries, and, in addition to holding positions as executive officers of ERAC-Missouri, Taylor, Nicholson, and Snyder serve on the boards of directors of the subsidiaries. These facts may demonstrate an opportunity to control the subsidiaries, but do not demonstrate that control was exercised. The first Lewis factor looks to "authority," but the Lewis decision provides no guidance whether the authority must be

exercised. In theory, every parent corporation has authority, at least to varying degrees, over a subsidiary corporation.[26] The facts pointed to by plaintiffs are relevant to the court's analysis of the <u>Lewis</u> factors, but standing alone those facts do no establish a joint employer relationship.

Similarly, plaintiffs argue Taylor, Nicholson, and Snyder possessed various powers with respect to the subsidiaries, including the powers to sell or acquire property, open bank accounts, and purchase insurance.[27] These individuals did not directly possess these powers; to the extent the board of directors had those powers, these individuals as members of the board by majority vote could exercise the powers. There is no evidence that the board of directors exercised these powers over the subsidiaries on behalf of ERAC-Missouri or that the individuals in their roles as executives of ERAC-Missouri exercised these powers. See <u>United States v. Bestfoods</u>, 524 U.S. 51, 69 (1998) (recognizing the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership"). Each subsidiary, acting through its board of directors comprised of Taylor, Nicholson, and Snyder, delegated responsibility for day-to-day management to general managers who worked solely for their respective operating subsidiaries.

Plaintiffs' arguments heavily focus upon the administrative services ERAC-Missouri offered to the subsidiaries. These services, however, are provided to the subsidiaries for a fee. A parent corporation may provide administrative services to subsidiaries without exercising control that rises to the degree to deem it a joint employer with the subsidiaries. See <u>Hukill v. Auto Care, Inc.</u>, 192 F.3d 437, 443-44 (4th Cir. 1999) (in the context of the FMLA, explaining that a

---

[26] A "parent corporation" is defined as a "corporation that has a controlling interest in another corporation (called a *subsidiary corporation*), usu. through ownership of more than one-half the voting stock." BLACK'S LAW DICTIONARY 393 (9th ed. 2009).

[27] <u>See</u> <u>supra</u> note 11 (explaining that, with respect to whether Taylor, Nicholson, or Snyder had the power to hire or terminate employees, the record lacks evidence that a board of directors had the direct power to take such action).

parent's practice of providing administrative services to its subsidiaries "is not unusual in today's business climate and is of no consequence. . . . Firms too tiny to achieve the realizable economies of scale or scope in their industry will go under unless they can integrate some of their operations with those of other companies, whether by contract or by ownership. . . .").  In addition, the evidence of record fails to establish that the services were extraordinary.  Without such evidence, the court cannot conclude that the services offered by ERAC-Missouri were a means of exercising control over the branch managers and assistant branch managers.

With respect to ERAC-Missouri's services, plaintiffs specifically argue that operating subsidiaries utilized ERAC-Missouri's ordering system to place orders for desired cars, and ERAC-Missouri's acquisition department negotiated purchases of vehicles for the operating subsidiaries.  Despite their use of these services, the subsidiaries determined which vehicles they would order, and some subsidiaries had local acquisition personnel.  Plaintiffs argue that ERAC-Missouri created an employee handbook and a "Business Ethics Guide, Personnel Policy, and Benefits Summary Plan Description" that were distributed to the operating subsidiaries, in addition to creating paid time off policies, paternity policies, and drug and alcohol testing policies.  The practices and policies, however, were recommendations that the subsidiaries were free to reject.  Even though ERAC-Missouri created and distributed the annual review form used to evaluate the performance of assistant branch managers, the subsidiaries administered the review of the employees and there is no evidence that subsidiaries were compelled to use the forms.

Plaintiffs argue that ERAC-Missouri compelled the operating subsidiaries to comply with the terms of nationwide rental contracts negotiated by ERAC-Missouri with large customers.  Keyes, the vice president and general manager of Enterprise Leasing Company of Philadelphia,

LLC, testified, however, that he was not compelled to abide by these contracts, and Mogauro's testimony, despite there being an indication in the language of the contract that his branches were "required to honor the rates contained in the agreement," is ambiguous with respect to whether compliance was mandatory. (Pls.' App., Ex. 4 at 103.) Darrah, ERAC-Missouri's executive vice president of North America, testified that prior to execution of a nationwide contract with IBM, an operating subsidiary with branch locations in Atlanta expressed to ERAC-Missouri concern over the terms of the contract and the implications it would have on its business. The implications of national contracts, while relevant to personal jurisdiction issues, do not affect the terms and conditions of the employment of branch managers and assistant branch managers.

Plaintiffs argue that the subsidiaries, with the exception of subsidiaries located in California, followed the direction of ERAC-Missouri in classifying assistant branch managers as exempt from the overtime provisions of the FLSA. Plaintiffs argue that ERAC-Missouri made the decision to classify, or maintain the classification of, assistant branch managers as exempt at a meeting in 2005. ERAC-Missouri responds that the testimony of the general managers, and in particularly the testimony of Mogauro, Keyes, and Nettles, establishes that the exempt status of the assistant branch managers at a particular location was the general manager's decision. Keyes testified that if he wanted to reconsider the classification of the assistant branch managers, he would have consulted Allen, but the decision was his and his alone. Nettles testified he made the decision to classify the assistant branch managers as exempt prior to the creation of the recommendations.

Plaintiffs argue that Darrah testified that the work of the employees of the subsidiaries was integral to ERAC-Missouri, but this fact does not demonstrate that ERAC-Missouri exercised control over the subsidiaries. Defendants correctly note that this testimony merely

establishes that if the operating subsidiaries financially fail to perform well, ERAC-Missouri is unlikely financially to perform well.  The same would be true with respect to any parent-subsidiary relationship.  The performance of subsidiaries is critical to a holding company.

### E. Application of <u>Lewis</u> Factors

#### 1. First Factor

With respect to the first <u>Lewis</u> factor – whether ERAC-Missouri had the authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours – ERAC-Missouri argues that, although it provides a number of services relevant to the particulars of plaintiffs' employment, the operating subsidiaries set the terms and conditions of employment.  Each operating subsidiary through its general manager hired and fired branch managers and assistant branch managers working for that subsidiary.  No directors, officers, or employees of ERAC-Missouri were involved in the hiring process.  The operating subsidiaries through their general managers decided the locations for rental facilities and the hours those facilities would operate.  The operating subsidiaries through their general managers also decided the days and hours branch managers and assistant branch managers would work at those facilities.

ERAC-Missouri aggregated compensation data from its operating subsidiaries across the country and shared it in the Management Compensation Guide.  ERAC-Missouri recommended guidelines to its operating subsidiaries.  There is evidence that the operating subsidiaries had discretion to vary from the Management Compensation Guide, and the subsidiaries through their general managers made the decisions that affected the terms and conditions of employment of their branch managers and assistant branch managers.  General managers of the operating

subsidiaries testified they had discretion to determine whether branch managers and assistant branch managers were classified as exempt from receiving premium overtime compensation for hours worked in excess of forty hours per week. All defendant operating subsidiaries, however, followed the recommendations and guidelines created by ERAC-Missouri, including the recommendation to classify assistant branch managers as exempt. The dispute with respect to these facts is whether they support a reasonable inference that the recommendations and guidelines created by ERAC-Missouri were de facto mandatory.

Under the first prong of the first <u>Lewis</u> factor, there is no evidence that ERAC-Missouri hired or fired assistant branch managers. Although plaintiffs argue that Taylor, Nicholson, and Snyder, being all the members of the boards of directors of the operating subsidiaries, had the power to do so, the powers to the extent they were granted would only be exercisable by reason of those individuals' service as a board member of the relevant operating subsidiary. There, however, is no evidence such powers were exercised. Under the second prong, there is no evidence that ERAC-Missouri promulgated work rules or assignments. As one of its services, ERAC-Missouri provided a dress code, but there is undisputed evidence that the code was not followed by certain subsidiaries. The third prong of the first factor considers whether ERAC-Missouri set the terms and conditions of employment. ERAC-Missouri provided benefits packages to employees. ERAC-Missouri also recommended a job description, compensation, and FLSA exemption status for assistant branch managers, and a genuine issue of fact exists whether the recommendations were advisory in nature. ERAC-Missouri did not, however, set hours for assistant branch managers. In light of all the relevant considerations, the court finds some of the evidence with respect to the first <u>Lewis</u> factor favors plaintiffs' position and other evidence favors ERAC-Missouri's position. The court considers the weight of the evidence is

equally balanced.  <u>Cf.</u> <u>Zachary v. Rescare Oklahoma, Inc.</u>, 471 F. Supp. 2d 1175, 1180-81 (N.D. Okla. 2006) (finding the parent was a joint employer as a matter of law, because an employee of the parent had *direct* control over the relevant employment decision and general control over personnel matters; the evidence supported the conclusion that the parent was a joint employer because the parent "'determined the rate and method of payment' that is at issue in this case and, at least to some extent, 'supervised and controlled the conditions of employment'").

### 2. Second Factor

With respect to the second <u>Lewis</u> factor – whether ERAC-Missouri supervised employees on a daily basis, including employee discipline – ERAC-Missouri argues that the operating subsidiaries supervised plaintiffs.  The employees of the operating subsidiaries ultimately reported to and were disciplined by general managers.  The general managers were executive officers of their respective subsidiaries, and worked solely for those subsidiaries as their operational leaders.  ERAC-Missouri argues that the sample plaintiffs consistently testified during their depositions that no one from ERAC-Missouri played any role in supervising their employment.  There is no evidence of record to the contrary.  Based upon the undisputed facts, this factor weighs in ERAC-Missouri's favor.

### 3. Third Factor

With respect to the third <u>Lewis</u> factor – whether ERAC-Missouri controlled employee records, including payroll, insurance, taxes and other similar records – ERAC-Missouri argues that the operating subsidiaries controlled plaintiffs' employment records.  The operating subsidiaries operated their own human resources departments, and maintained their own personnel files.  With the exception of four subsidiaries that purchased payroll services from ERAC-Missouri for a fee, the operating subsidiaries purchased payroll services from third-

parties that process paychecks. The employees were paid directly from bank accounts owned by the relevant operating subsidiaries which employed them. These facts, which are not disputed, support weighing the third factor in favor of ERAC-Missouri's position.

### 4. Weight of Factors

Upon analysis of the <u>Lewis</u> factors and viewing the evidence in light most favorable to plaintiffs, plaintiffs cannot establish the second or third factors, and the first factor carries neutral weight. "The presence of any individual factor is not dispositive of whether an employee/employer relationship exists." <u>Real v. Driscoll Strawberry Assocs., Inc.</u>, 603 F.2d 748, 754 (9th Cir. 1979). The court concludes that, after weighing the <u>Lewis</u> factors and considering the rationales of <u>Braden</u> and <u>Maddock</u>, the overall circumstances indicate that for purposes of the FLSA the economic realities of plaintiffs' situations necessitate a finding that ERAC-Missouri did not jointly employ plaintiffs. Summary judgment must be granted in favor of ERAC-Missouri with respect to the joint employer issues. <u>See</u> <u>Zheng v. Liberty Apparel Co.</u>, 355 F.3d 61, 76-77 (2d Cir. 2003) (in order to grant summary judgment, "the Court need not decide that *every* factor weighs against joint employment," and "there is the conclusion of law to be drawn from applying the factors, *i.e.*, whether an entity is a joint employer").

## VI. Conclusion

For the reasons set forth in this memorandum opinion, ERAC-Missouri's motion to dismiss the amended master complaint (Docket No. 65, Misc. No. 09-210) is denied without prejudice, and ERAC-Missouri's motion for summary judgment on joint employer issues (Docket No. 124) is granted.

Dated:  August 13, 2010

By the court,

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge